[No. S035624. Dec. 30, 1994.]

THE PEOPLE, Plaintiff and Appellant, v.
SUSAN VALERIE HEITZMAN, Defendant and Respondent.

## Counsel

Michael R. Capizzi, District Attorney, Maurice L. Evans, Chief Assistant District Attorney, Wallace J. Wade, Assistant District Attorney, and Kathleen M. Harper, Deputy District Attorney, for Plaintiff and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Thomas A. Temmerman, Assistant Attorney General, Gary A. Binkerd and Gabriel C. Vivas, Deputy Attorneys General, as Amici Curiae on behalf of Plaintiff and Appellant.

Richard Schwartzberg, under appointment by the Supreme Court, for Defendant and Respondent.

## Opinion

LUCAS, C. J.—Penal Code section 368, subdivision (a),[1] is one component of a multifaceted legislative response to the problem of elder abuse. The statute imposes felony criminal liability on "[a]ny person who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any elder or dependent adult, with knowledge that he or she is an elder or dependent adult, to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any elder or dependent adult, willfully causes or permits the person or health of the elder or dependent adult to be injured, or willfully causes or permits the elder or dependent adult to be placed in a situation such that his or her person or health is endangered . . . ."[2]

In this case, we must decide whether the statute meets constitutional standards of certainty. As we shall explain, we conclude initially that, on its face, the broad statutory language at issue here fails to provide fair notice to those who may be subjected to criminal liability for "willfully . . . permit-[ting]" an elder or dependent adult to suffer pain, and similarly fails to set forth a uniform standard under which police and prosecutors can consistently enforce the proscription against "willfully . . . permit[ting]" such suffering. Under these circumstances, section 368(a) would be unconstitutionally vague absent some judicial construction clarifying its uncertainties.

[1]Hereafter referred to as section 368(a); all further statutory references are to this code unless noted otherwise.

[2]"Elder" is defined as "any person who is 65 years of age or older." (§ 368, subd. (d).) Section 368, subdivision (e), defines "dependent adult" as any person between 18 and 64 years of age "who has physical or mental limitations which restrict his or her ability to carry out normal activities or to protect his or her rights . . . ."

We conclude that the statute may properly be upheld by interpreting its imposition of criminal liability upon "[a]ny person who . . . permits . . . any elder or dependent adult . . . to suffer . . . unjustifiable pain or mental suffering" to apply only to a person who, under existing tort principles, has a duty to control the conduct of the individual who is directly causing or inflicting abuse on the elder or dependent adult. Because the evidence in this case does not indicate that defendant had the kind of "special relationship" with the individuals alleged to have directly abused the elder victim that would give rise to a duty on her part to control their conduct, she was improperly charged with a violation of section 368(a). We therefore reverse the judgment of the Court of Appeal.

## I. FACTS

The egregious facts of this case paint a profoundly disturbing family portrait in which continued neglect of and apparent indifference to the basic needs of the family's most vulnerable member, an elderly dependent parent, led to a result of tragic proportion. Sixty-seven-year-old Robert Heitzman resided in the Huntington Beach home of his grown son, Richard Heitzman, Sr., along with another grown son, Jerry Heitzman, and Richard's three sons. On December 3, 1990, police were summoned to the house, where they discovered Robert dead in his bedroom. His body lay on a mattress that was rotted through from constant wetness, exposing the metal springs. The stench of urine and feces filled not only decedent's bedroom, but the entire house as well. His bathroom was filthy, and the bathtub contained fetid, green-colored water that appeared to have been there for some time.

Police learned that Jerry Heitzman was primarily responsible for his father's care, rendering caretaking services in exchange for room and board. Jerry admitted that he had withheld all food and liquids from his father for the three days preceding his death on December 3. Jerry explained that he was expecting company for dinner on Sunday, December 2, and did not want his father, who no longer had control over his bowels and bladder, to defecate or urinate because it would further cause the house to smell.

At the time of his death, decedent had large, decubitus ulcers, more commonly referred to as bed sores, covering one-sixth of his body. An autopsy revealed the existence of a yeast infection in his mouth, and showed that he suffered from congestive heart failure, bronchial pneumonia, and hepatitis. The forensic pathologist who performed the autopsy attributed decedent's death to septic shock due to the sores which, he opined, were caused by malnutrition, dehydration, and neglect.

Twenty years earlier, decedent had suffered a series of strokes that paralyzed the left side of his body. Defendant, 31-year-old Susan Valerie

Heitzman, another of decedent's children, had previously lived in the home and had been her father's primary caregiver at that time. In return, defendant's brother Richard paid for her room and board. Richard supported the household by working two full-time jobs, and supplemented this income with decedent's monthly Social Security and pension checks.

One year prior to her father's death, defendant decided to move away from the home. After she moved out, however, she continued to spend time at the house visiting her boyfriend/nephew Richard, Jr. Since leaving to live on her own, she noticed that the entire house had become filthy. She was aware that a social worker had discussed with Jerry the need to take their father to a doctor. When she spoke to Jerry about it, he told her he had lost the doctor's telephone number the social worker had given him. She suggested to Jerry that he recontact the social worker. She also discussed with Richard, Jr., the need for taking her father to the doctor, but she never made the necessary arrangements.

In the last six weekends before her father died, defendant had routinely visited the household. She was last in her father's bedroom five weeks prior to his death, at which time she noticed the hole in the mattress and feces-soiled clothing lying on the floor. Another of decedent's daughters, Lisa, also visited the house that same day.

Two weeks prior to her father's death, defendant spent the entire weekend at the house. On Sunday afternoon, she saw her father sitting in the living room, and noticed that he looked weak and appeared disoriented. A week later, during Thanksgiving weekend, and several days prior to decedent's death, defendant again stayed at the house. Decedent's bedroom door remained closed throughout the weekend, and defendant did not see her father. On the day decedent died, defendant awoke midmorning and left the house to return to her own apartment. Around one o'clock in the afternoon, Jerry discovered decedent dead in his bedroom.

In a two-count indictment, the Orange County District Attorney jointly charged Jerry and Richard, Sr., with involuntary manslaughter (§ 192), and Jerry, Richard, Sr., and defendant with violating section 368(a). At the preliminary examination, the magistrate determined that, although defendant did not have care or custody of decedent as did her brothers, there was probable cause to believe she owed a duty of care to her father and that she had been grossly negligent in failing to carry out that duty. She was therefore

held to answer along with her brothers for willfully permitting an elder to suffer unjustifiable physical pain and mental suffering.[3]

On November 4, 1994, an information was filed in superior court charging defendant with a violation of section 368(a). Thereafter, she moved to set aside the information pursuant to section 995 on the basis that the evidence presented at the preliminary hearing failed to establish probable cause she had committed a crime. In relevant part, defendant argued that the evidence that she knew of her father's deteriorating condition did not create a duty for her to act to prevent the harm suffered by him. In its opposition to her motion, the prosecution contended that defendant's duty of care was established by section 368(a) itself, which imposes a duty on every person to not permit any elderly or dependent adult to suffer unjustifiable pain.

After hearing oral argument on defendant's motion, the court took the matter under submission and, at the same time, granted defendant leave to file a demurrer. Defendant thereafter demurred to the information, pursuant to section 1004, subdivisions 4 and 5, arguing that section 368(a) is unconstitutionally vague because, by purporting to punish any person for permitting the infliction of pain or mental suffering on any elder, the statute fails to adequately define the class of persons having a legal duty to protect elders from such abuse.

The superior court agreed with defendant that the statutory language at issue was unconstitutionally vague, sustained the demurrer and dismissed the case against her.[4] The People appealed the court's order of dismissal, and the Court of Appeal reversed with directions to overrule the demurrer.[5] It first determined that, because her alleged complicity in her father's death was solely one of inaction, defendant could be held criminally liable under section 368(a) only if she was under a duty to act. The court found that such a duty did exist, based on the special relationship between a parent and child codified in the financial support statutes, section 270c and Civil Code former sections 206 and 242, and thus rejected defendant's vagueness challenge.

---

[3]The prosecution of Jerry and Richard, Sr., for their role in their father's death was clearly proper, and is not being challeged here.

[4]The transcript of the hearing on defendant's demurrer does not make clear the trial court's precise ruling as to defendant's section 995 motion to set aside the information, previously taken under submission. We will presume for our purposes here that, in dismissing the case against defendant, the trial court was granting defendant's motion to set aside the charges against her, as well as sustaining her demurrer.

[5]In its opinion, the Court of Appeal affirmed its understanding of the trial court's ruling as to defendant's section 995 motion, agreeing with the trial court that defendant could not be charged with violating that part of the statute applicable to individuals having the care or custody of the victim. As previously noted, although it is unclear what the trial court ruled with respect to defendant's section 995 motion, we will presume that the motion was granted.

The court concluded that, as the daughter of a "pensioner" father, defendant was under a duty to act, without gross negligence, to repel a threat to her father's well-being, and that therefore she was properly charged with a violation of section 368(a).

Defendant and the People each sought review of the Court of Appeal's decision reversing the superior court's order sustaining the demurrer. Although the People prevailed below, they sought review on the ground that by construing the statute as incorporating the financial support statutes, the Court of Appeal had impermissibly added two elements to the crime of elder abuse, i.e., a filial relationship between the perpetrator and the victim, and an indigent victim. We granted both petitions.

## II. DISCUSSION

### A. *Criminal Liability for a Failure to Act*

█ Section 368(a) purportedly reaches two categories of offenders: (1) *any person* who willfully causes or permits an elder to suffer, or who directly inflicts, unjustifiable pain or mental suffering on any elder, and (2) the elder's *caretaker or custodian* who willfully causes or permits injury to his or her charge, or who willfully causes or permits the elder to be placed in a dangerous situation. The statute may be applied to a wide range of abusive situations, including within its scope active, assaultive conduct, as well as passive forms of abuse, such as extreme neglect. (Cf. *People v. Smith* (1984) 35 Cal.3d 798, 806 [201 Cal.Rptr. 311, 678 P.2d 886] [construing identical language in felony child abuse statute].)

█ Defendant here was charged under section 368(a) with willfully *permitting* her elder father to suffer the infliction of unjustifiable pain and mental suffering. It was thus her *failure to act*, i.e., her failure to prevent the infliction of abuse on her father, that created the potential for her criminal liability under the statute.[6] █ Unlike the imposition of criminal penalties for certain positive acts, which is based on the statutory proscription of such conduct, when an individual's criminal liability is based on the *failure* to act, it is well established that he or she must first be under an existing legal duty to take positive action. (See *Barber v. Superior Court* (1983) 147 Cal.App.3d 1006, 1017 [195 Cal.Rptr. 484, 47 A.L.R.4th 1]; 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Elements of Crime, § 115, pp. 135-136; Perkins & Boyce, Criminal Law (3d ed. 1982) Imputability, p. 660, and cases cited; see also Beale, *The Proximate Consequences of an Act*

---

[6]There was no claim that defendant willfully *caused* the infliction of pain on her father, and we do not address that portion of the statute here.

(1920) 33 Harv. L.Rev. 633, 637 ["The non-action of one who has no legal duty to act is nothing."].)

A legal duty to act is often imposed by the express provisions of a criminal statute itself. (See 1 Witkin & Epstein, Cal. Criminal Law, *supra*, Elements of Crime, § 115, p. 136; see also LaFave & Scott, Criminal Law (2d ed. 1986) § 3.3, p. 203.) Welfare and Institutions Code section 15630 provides an example. That statute specifically requires care custodians, health practitioners, adult protective services employees, and local law enforcement agencies to report physical abuse of elders and dependent adults. Those subject to the statutory duty to report who fail to do so face criminal liability. (Welf. & Inst. Code, § 15634, subd. (d).) Notably, the statutory scheme encourages any person who knows or suspects that an elder or dependent adult has been the victim of abuse to report the abuse, but does not appear to impose the *legal duty* to do so. (See Welf. & Inst. Code, § 15631, subd. (a) ["Any . . . person . . . *may* report . . . ." (Italics added.)].)

When a criminal statute does not set forth a legal duty to act by its express terms, liability for a failure to act must be premised on the existence of a duty found elsewhere. (See LaFave & Scott, Criminal Law, *supra*, § 3.3, p. 203.) A criminal statute may thus incorporate a duty imposed by another criminal or civil statute. (*Ibid.*) In *Williams* v. *Garcetti* (1993) 5 Cal.4th 561 [20 Cal.Rptr.2d 341, 853 P.2d 507], for example, we concluded that the language of section 272, making parents criminally liable if they fail to exercise reasonable care, supervision, protection, and control over their children, incorporated the definitions and limits of parental duties that have long been a part of California's dependency and tort law. (*Williams* v. *Garcetti*, *supra*, 5 Cal.4th at pp. 570, 572; see also *People* v. *Glenn* (1985) 164 Cal.App.3d 736, 739 [211 Cal.Rptr. 547] [section 1202.4's lack of provisions for enforcing the defendant's payment of restitution to victim does not render statute unconstitutionally vague; enforcement provisions found within various Government Code sections].)

A criminal statute may also embody a common law duty based on the legal relationship between the defendant and the victim, such as that imposed on parents to care for and protect their minor children. (LaFave & Scott, Criminal Law, *supra*, § 3.3, pp. 203-204; see, e.g., *People* v. *Burden* (1977) 72 Cal.App.3d 603 [140 Cal.Rptr. 282] [murder defendant father under common law duty to care for young son].) Similarly, other special relationships may give rise to a duty to act. (LaFave & Scott, *supra*, § 3.3, pp. 205-207; 1 Witkin & Epstein, Cal. Criminal Law, *supra*, Elements of Crime, § 115, p. 136.) Thus, in *People* v. *Oliver* (1989) 210 Cal.App.3d 138 [258 Cal.Rptr. 138], the court relied on the existence of a special relationship

recognized in California civil cases and the Restatement Second of Torts to affirm the defendant's conviction of involuntary manslaughter for her failure to seek medical aid for the victim, a man she had met at a bar and brought to her home who later died of a heroin overdose. (*People* v. *Oliver, supra,* 210 Cal.App.3d at pp. 148-149 [defendant's taking charge of person unable to prevent harm to himself, and her conduct creating risk of injury to victim, gave rise to duty to act].)

Accordingly, in order for criminal liability to attach under section 368(a) for willfully permitting the infliction of physical pain or mental suffering on an elder, a defendant must first be under a legal duty to act. Whether the statute adequately denotes the class of persons who owe such a duty is the focus of the constitutional question presented here.

B. *Vagueness*

The Fourteenth Amendment to the United States Constitution and article I, section 7 of the California Constitution, each guarantee that no person shall be deprived of life, liberty, or property without due process of law. This constitutional command requires "a reasonable degree of certainty in legislation, especially in the criminal law . . . ." (*In re Newbern* (1960) 53 Cal.2d 786, 792 [3 Cal.Rptr. 364, 350 P.2d 116].) "[A] penal statute [must] define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." (*Kolender* v. *Lawson* (1983) 461 U.S. 352, 357 [75 L.Ed.2d 903, 908-909, 103 S.Ct. 1855]; see also *Burg* v. *Municipal Court* (1983) 35 Cal.3d 257, 269 [198 Cal.Rptr. 145, 673 P.2d 732].)

It is established that in order for a criminal statute to satisfy the dictates of due process, two requirements must be met. First, the provision must be definite enough to provide a standard of conduct for those whose activities are proscribed. (*People* v. *Superior Court* (*Caswell*) (1988) 46 Cal.3d 381, 389 [250 Cal.Rptr. 515, 758 P.2d 1046]; see also *Walker* v. *Superior Court* (1988) 47 Cal.3d 112, 141 [253 Cal.Rptr. 1, 763 P.2d 852].) Because we assume that individuals are free to choose between lawful and unlawful conduct, "we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he [or she] may act accordingly. Vague laws trap the innocent by not providing fair warning." (*Grayned* v. *City of Rockford* (1972) 408 U.S. 104, 108 [33 L.Ed.2d 222, 227, 92 S.Ct. 2294]; see *Cranston* v. *City of Richmond* (1985) 40 Cal.3d 755, 763 [221 Cal.Rptr. 779, 710 P.2d 845].)

Second, the statute must provide definite guidelines for the police in order to prevent arbitrary and discriminatory enforcement. (*People* v. *Superior*

*Court* (*Caswell*), *supra*, 46 Cal.3d at p. 390; *Burg* v. *Municipal Court*, *supra*, 35 Cal.3d 257, 269.) When the Legislature fails to provide such guidelines, the mere existence of a criminal statute may permit " 'a standardless sweep' " that allows police officers, prosecutors and juries " 'to pursue their personal predilections.' " (*Kolender* v. *Lawson*, *supra*, 461 U.S. at p. 358 [75 L.Ed.2d at pp. 909-910], quoting *Smith* v. *Goguen* (1973) 415 U.S. 566, 575 [39 L.Ed.2d 605, 613, 94 S.Ct. 1242]; *Walker* v. *Superior Court*, *supra*, 47 Cal.3d at p. 142.)

 As to the first prong of our inquiry, in determining whether the relevant language of section 368(a) is sufficiently certain to meet the constitutional requirement of fair notice, "we look first to the language of the statute, then to its legislative history, and finally to the California decisions construing the statutory language." (*Pryor* v. *Municipal Court* (1979) 25 Cal.3d 238, 246 [158 Cal.Rptr. 330, 599 P.2d 636].) This analytical framework is consistent with the notion that we "require citizens to apprise themselves not only of statutory language, but also of legislative history, subsequent judicial construction, and underlying legislative purposes." (*Walker* v. *Superior Court*, *supra*, 47 Cal.3d at p. 143, citing *People* v. *Grubb* (1965) 63 Cal.2d 614, 620 [47 Cal.Rptr. 772, 408 P.2d 100].)

In relevant part, section 368(a) makes it a felony for any person to willfully permit the infliction of pain or suffering on an elder.[7] Defendant claims that the statute is unconstitutionally vague because it purports to impose a legal duty to prevent the infliction of physical or mental abuse on an elder on those, such as herself, who might not reasonably know they have such a duty. The People argue that the statute has no constitutional infirmity because, in clear and unambiguous terms, section 368(a) *itself* imposes the duty giving rise to criminal liability. According to the People, the statute provides fair notice to *every* individual that he or she is charged with the responsibility to prevent the infliction of abuse on any elder.

For several reasons, we reject the People's contention that the statute itself imposes a blanket duty on everyone to prevent the abuse of any elder. The wide net cast by a statutory interpretation imposing such a duty on every person is apparent when we consider that it would extend the potential for criminal liability to, for example, a delivery person who, having entered a private home, notices an elder in a disheveled or disoriented state and purposefully fails to intervene.

 Under general principles of tort law, *civil* liability is not imposed for the failure to assist or protect another, absent some legal or special relationship between the parties giving rise to a duty to act. (*Williams* v. *State of*

---

[7]The statute protects both elders and dependent adults from abuse. For purposes of brevity, our use of the word "elder" includes the entire protected class unless otherwise indicated.

*California* (1983) 34 Cal.3d 18, 23 [192 Cal.Rptr. 233, 664 P.2d 137] [no duty to aid another unless special relationship exists]; see also 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 858, p. 220.) ▮▮▮ In the absence of any indication, express or implied, that the Legislature meant to depart so dramatically from this principle, well established at the time section 368(a) was enacted, it would be unreasonable to interpret the statute as imposing a more serious form of liability, indeed, *felony criminal liability*, on every person who fails to prevent an elder from suffering abuse, absent some legal or special relationship between the parties.[8] (Cf. *People* v. *Oliver*, *supra*, 210 Cal.App.3d at p. 147 [relying on tort law principles of duty as guide in criminal context]; see also LaFave & Scott, Criminal Law, *supra*, § 3.3, p. 203.)

Moreover, such a reading of the statutory language would create the anomaly of imposing on every individual the duty to *prevent* abuse, while a different statutory scheme, adopted *after* the enactment of section 368(a), expressly excludes everyone but a small number of health care, social services and public safety individuals from the duty to *report* abuse. (See Welf. & Inst. Code, § 15631, subd. (a) ["Any . . . person . . . *may* report . . . ." (Italics added.)].) Thus, because section 368(a) may not be read as imposing a duty on every person, the facial language of the statute does not convey adequate notice to those who may be under a duty to prevent the infliction of abuse on an elder. We therefore look to section 368(a)'s legislative history as a guide to its interpretation.[9]

The first of several reports on elder abuse commissioned by the House of Representatives was released in 1981 (see House Select Com. on Aging,

---

[8]According to one treatise, the failure of the law to impose a broad legal duty to render assistance to one in need "has probably been due to the difficulty of definition coupled with a rather pronounced mind-your-own-business philosophy." (Perkins & Boyce, Criminal Law, *supra*, Imputability, p. 661.) As Professor Jerome Hall has suggested, "the reason the stranger who refuses food to a hungry child escapes any liability while the latter's father might be guilty of a criminal homicide is that, despite avowals, we have not reached the point of really believing that everyone is morally obliged to be his brother's keeper; or, at least, that is not believed sufficiently to be given implementation by the criminal law." (Hall, General Principles of Criminal Law (2d ed. 1960) Criminal Conduct, p. 210.)

[9]The dissent expresses concern that by rejecting a plain meaning construction of the statute, we have undermined other laws imposing criminal liability for a failure to act. Such concern may be overstated, however. Although the dissent may be correct in a strictly literal sense in stating that section 368(a) is not the only statute making it a crime for "any" and all persons to willfully or knowingly "permit" or "allow" a specified wrong to occur, several of the statutes cited as examples by the dissent clearly present no uncertainty as to who may be under a duty to act. Thus, Business and Professions Code section 4992.7 makes it a misdemeanor for an individual applying for a social worker license to "permit" another person to impersonate him or her in connection with any application or exam. The duty imposed by the statute is defined and limited by the very nature of the statute, which necessarily applies only to would-be social workers. Likewise, section 588, which makes it a crime to "permit" water from any sprinkler, ditch, etc., to flow on a public highway, imposes

97th Cong., 1st Sess., Elder Abuse: An Examination of a Hidden Problem (Com. Print 1981)), and in its wake, the subject received much congressional attention and national publicity. (Note, *Elder Abuse and the States' Adult Protective Services Response* (1991) 42 Hastings L.J. 861, 869.) California lawmakers responded to the newly documented evidence of elder abuse in 1982 with legislation recognizing "that dependent adults may be subject to abuse, neglect, or abandonment and that this state has a responsibility to protect such persons." (Former Welf. & Inst. Code, § 15600, added by Stats. 1982, ch. 1184, § 3, p. 4223.) This first piece of legislation addressing the issue, now codified at Welfare and Institutions Code sections 15600 through 15637, encouraged, but did not require, health care providers to report suspected cases of abuse of dependent adults.[10] (See generally, *ARA Living Centers-Pacific, Inc.* v. *Superior Court* (1993) 18 Cal.App.4th 1556, 1559 [23 Cal.Rptr.2d 224]; Note, *Elder Abuse and the States' Adult Protective Services Response, supra*, 42 Hastings L.J. at p. 921.)

In 1983, the Legislature passed the state's first law focusing exclusively on those 65 years of age or older, requiring elder care custodians and other specified professionals to report instances of elder abuse. (Welf. & Inst. Code, §§ 9380-9386, added by Stats. 1983, ch. 1273, § 2 and repealed by Stats. 1986, ch. 769, § 1.3, eff. Sept. 15, 1986.) That same year, Senate Bill No. 248, 1983-1984 Regular Session, was introduced at the request of the Santa Ana Police Department. An analysis of the bill prepared for the Senate Committee on the Judiciary indicates that the goal of the legislation was to aid in the prosecution of people who harm or neglect dependent adults. (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 248 (1983-1984 Reg. Sess.) p. 2.) According to this document, law enforcement agencies receiving reports concerning suspected abuse or neglect of dependent adults were having difficulty finding Penal Code sections under which they could prosecute such cases. (*Ibid.*) The solution proposed by the bill was to establish the same criminal penalties for the abuse of a dependent adult as those found in sections 273a and 273d for child abuse. (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 248, *supra*, at p. 1.) When drafting the new legislation, the bill's author lifted the language of the child abuse statutes in its entirety,

---

a duty on any individual exercising control over the water delivery systems or containment structures enumerated in that statute.

[10] In 1985 the statute was amended to impose on elder care custodians, health practitioners, adult protective services agency personnel, and law enforcement personnel a statutory duty to report abuse of dependent adults. (Stats. 1985, ch. 1164, § 7, p. 3921.)

replacing the word "child" with "dependent adult" throughout. (See *id* at. pp. 2-3.)[11]

The probable justification for modeling the proposed legislation on the language of existing child abuse statutes was the assumption that, similar to children, dependent adults could neither speak for, nor protect, themselves. (See Faulkner, *Mandating the Reporting of Suspected Cases of Elder Abuse: An Inappropriate, Ineffective and Ageist Response to the Abuse of Older Adults* (1982) 16 Fam. L.Q. 69, 76.) Such a view was expressed in an analysis of Senate Bill No. 248 prepared by the Judicial Council of California. Noting that improvements in geriatric medicine had resulted in a growing number of older persons who cannot properly care for themselves, the Judicial Council observed that "[t]he position of [dependent adults] is analogous to that of children, in that the disabilities of age or a physical or mental condition may make them as helpless at the hands of a caretaking adult as is a small child. In some respects, their position may be even worse than a child's because they are likely to understand fully what is happening, yet lack sufficient control of their circumstances to be able to do anything about it." (Judicial Council of Cal., Review and Analysis of Sen. Bill No. 248 (Mar. 24, 1983) p. 2.)[12]

■ The legislative history thus indicates that, like the purpose underlying the felony child abuse statute from which it derives, section 368(a) was enacted in order to protect the members of a vulnerable class from abusive situations in which serious injury or death is likely to occur. (Cf. *People* v.

---

[11]After the statute was enacted late in 1983, several nonsubstantive changes were made. (Stats. 1984, ch. 144, § 160, p. 482.) Later, in conjunction with legislation designed to consolidate the two sets of conflicting reporting laws for elder abuse and dependent adult abuse, a 1986 amendment to section 368(a) made the section expressly applicable to elders as well as dependent adults. (Stats. 1986, ch. 769, § 1.2, p. 2531, urgency measure eff. Sept. 15, 1986.)

Although the amendment was intended merely to conform the definition of "dependent adult" in the Penal Code to the definition of "dependent adult" in the Welfare and Institutions Code (see Sen. Judiciary Com. Rep. on Assem. Bill No. 3988 (1985-1986 Reg. Sess.)), it appears to have, at the same time, broadened the class of persons protected by the statute. "Elder" is defined as "any person who is 65 years of age or older." (§ 368, subd. (d).) The preamendment definition of "dependent adult" referred to "any person who, because of any mental disability due to birth defect, physical disorder, or *advanced age*, is unable to properly provide for his or her own personal needs with regard to his or her physical health, food clothing or shelter . . . ." Thus, following the 1986 amendment, *any* elder, regardless of whether he or she could properly provide for his or her personal needs, was protected by the statute.

[12]California is not the only state to have modeled its elder abuse statute after existing child abuse laws. According to one commentator, "The favorite response of state legislatures wishing to 'do something' visible about elder abuse in recent years has been the enactment of laws, centered around mandatory reporting, which borrow directly from child abuse statutes." (Crystal, *Elder Abuse: the Latest "Crisis"* (1987) 88 Pub. Interest 56, 59.)

*Jamarillo* (1979) 98 Cal.App.3d 830, 835 [159 Cal.Rptr. 771] [describing purpose of felony child abuse]; *People* v. *Lee* (1991) 234 Cal.App.3d 1214, 1220 [286 Cal.Rptr. 117] [same].) The Legislature was presumably aware that, under the proposed legislation, some individuals would be subject to criminal liability for conduct not previously unlawful. (See Youth and Correctional Agency, Enrolled Bill Rep. on Sen. Bill No. 248 (Sept. 13, 1983) p. 2.) How far the Legislature intended the potential reach of the new law to extend is not, however, entirely clear.

 The following profile of who might be covered under the legislation was presented to members of the Senate Judiciary Committee: "The person who abuses is usually the caretaker of the victim, that is, the person who officially or informally assumes responsibility for the care of the dependent person. This includes caretakers in licensed family homes or relatives: children, grandchildren or parents of the younger dependent adult." (Sen. Com. on Judiciary, Hearings on Sen. Bill No. 248 (1983-1984 Reg. Sess.) p. 2.) Thus, it is no surprise that the imposition of a duty on those having care or custody of an elder to protect his or her charge from injury or dangerous situations is expressly set forth in the second and third clauses of the statute. The legislative history is silent, however, concerning those who, in addition to caretakers and custodians, may be under a duty to prevent the infliction of elder abuse. Because of this silence, we next look to any cases that have construed the statute so as to provide the requisite certainty.

Our review of the case law indicates that although the constitutionality of section 368(a) has been considered by several courts, no decision has construed the statute for the purpose of clarifying who owes a duty to protect elders from the infliction of abuse. In *People* v. *McKelvey* (1991) 230 Cal.App.3d 399, 404 [281 Cal.Rptr. 359], the court opined that the portion of the statute at issue here was uncertain because it "does not describe those persons liable for permitting or causing a dependent adult to suffer." The court went no further in its analysis, however, because it rejected the defendant's vagueness challenge on the basis that his conduct was clearly encompassed by a different portion of section 368(a), in that he had assumed the care and custody of the elderly victim.[13] (*People* v. *McKelvey, supra,* 230 Cal.App.3d at p. 404.)

As indicated above, the legislative history reflects that the language of section 368(a) derives verbatim from the felony child abuse statute, section

---

[13]The focus of our inquiry in this case is on whether section 368(a) provides constitutionally sufficient notice as to the class of persons owing a duty to prevent the infliction of abuse on an elder. Although we are not presented here with the question whether the duty imposed on caretakers or custodians by the statute to prevent injury or endangerment to their charge is unconstitutionally vague, we note that the issue was recently decided in *People* v. *Manis* (1992) 10 Cal.App.4th 110 [12 Cal.Rptr.2d 619]. In *People* v. *Manis,* the court upheld the constitutionality of section 368(a), concluding, in relevant part, that the meaning of the word

273a. It is therefore appropriate to review the decisions interpreting that statute to ascertain the reach of the statute at issue here. (See 1 Witkin & Epstein, *supra*, Introduction to Crimes, § 49, p. 58; cf. *People* v. *Poulin* (1972) 27 Cal.App.3d 54, 61 [103 Cal.Rptr. 623] [term "great bodily injury" made certain by reference to judicial construction of same language in different Penal Code section].)

A number of courts have considered and rejected vagueness challenges to various aspects of the felony child abuse statute. (See *People* v. *Smith, supra*, 35 Cal.3d at p. 810 [citing cases].) An examination of these cases reveals, however, that none had occasion to examine the statute for the purpose of ascertaining those under a duty to protect a child from pain or suffering inflicted by another.[14] (See, e.g., *People* v. *Beaugez* (1965) 232 Cal.App.2d 650, 657 [43 Cal.Rptr. 28] ["willful" construed to mean purposeful or with knowledge of the consequences]; *People* v. *Curtiss* (1931) 116 Cal.App. Supp. 771, 778-781 [phrase "inflict unjustifiable pain and suffering" construed as question of fact under reasonableness standard].)

Thus, decisions construing either section 368(a) or the felony child abuse statute on which it was modeled do not provide a clear definition of those under a duty to protect either elders or children, respectively. Under these circumstances, section 368(a) fails to provide adequate notice as to the class of persons who may be under an affirmative duty to prevent the infliction of abuse. Of equal, if not greater, constitutional significance, police and prosecutors may lack sufficient standards under which to determine who is to be charged with permitting such abuse. (See *In re Newbern, supra*, 53 Cal.2d at p. 796; *Kolender* v. *Lawson, supra*, 461 U.S. at p. 358 [75 L.Ed.2d at pp. 909-910].)

---

"care" was not uncertain, and that no definition was necessary to provide fair notice. (10 Cal.App.4th at pp. 116-117.)

[14]Contrary to the dissent's assertion, the statutory language of section 273a does *not* support the view that section 368(a) imposes a duty on every person to prevent elder abuse. In every published case arising under section 273a involving a failure to act, rather than active abuse, the defendant was the *parent* of the child victim. (See, e.g., *People* v. *Northrop* (1982) 132 Cal.App.3d 1027 [182 Cal.Rptr. 197] [mother either permitted child to suffer or inflicted child's injuries herself]; *People* v. *Hernandez* (1980) 111 Cal.App.3d 888 [168 Cal.Rptr. 898] [child severely neglected by parents]; *People* v. *Peabody* (1975) 46 Cal.App.3d 43 [119 Cal.Rptr. 780] [mother permitted father to physically abuse their child]; *People* v. *Harris* (1966) 239 Cal.App.2d 393 [48 Cal.Rptr. 677] [mother permitted children to live in filthy environment].) In most of these cases, the defendant parent was charged under the statutory clause applicable to those having the care or custody of the victim. Had the parent been charged under the "any person" portion of the statute, however, liability would simply be based, not on the defendant's duty as a "person," but rather on the well-established *parental* duty to care for and protect his or her child. (Cf. *Williams* v. *Garcetti* (1993) 5 Cal.4th 561, 570 [20 Cal.Rptr.2d 341, 853 P.2d 507] [parents' legal responsibilities for care and protection of their children are well established and defined].)

As noted above, whether or not the lack of statutory clarity has opened the door to arbitrary or discriminatory enforcement of the law is the second prong of our inquiry into the constitutionality of section 368(a). (See *Pryor* v. *Municipal Court, supra,* 25 Cal.3d at p. 252; *Kolender* v. *Lawson, supra,* 461 U.S. at p. 358 [75 L.Ed.2d at pp. 909-910].) The facts of this case provide an apt demonstration of the *potential* for arbitrary or discriminatory enforcement of section 368(a), were its language to be interpreted broadly, without a limiting construction. (See *Pryor* v. *Municipal Court, supra,* 25 Cal.3d at p. 252.)

Three of the decedent's adult children, Richard, Sr., Jerry, and defendant were jointly charged with a violation of section 368(a). At the preliminary hearing, the prosecutor argued that both Richard, Sr., and Jerry had the care and custody of decedent and could therefore be held to answer under that portion of the statute pertaining to caretakers or custodians. The prosecutor argued further that, although defendant was not responsible for the care or custody of her father, she was properly charged under the first clause of section 368(a) as "any person" who willfully permitted any elder to suffer abuse.

Richard, Sr., and Jerry were not the only family members residing with decedent. Richard, Sr.'s three sons also lived in the home. One of these individuals, Richard, Jr., was defendant's boyfriend. For the last six weekends before her father's death, defendant had routinely been in the house visiting with Richard, Jr. Approximately one month before her father died, defendant discussed with Richard, Jr., the possibility of his helping her take decedent to the doctor. The record therefore would appear to support an inference that whatever defendant knew about her father's deteriorating condition, Richard, Jr., knew as well. Under the prosecutor's reading of the statutory language, the first part of section 368(a) would also appear to be applicable to decedent's grandson, Richard, Jr. He was, however, neither arrested nor charged.

Lisa, a fourth Heitzman sibling who, like defendant, did not reside in the same house as her father and brothers, had visited the home five weeks before decedent's death. She was present in the home when defendant entered their father's room for the last time and discovered the hole where the mattress had rotted through. The record also indicates that at one point Lisa contacted the Orange County Department of Social Services concerning her father's condition, but that the agency did not follow up on her call. It would thus appear that Lisa, like defendant, was well aware of decedent's situation. Unlike defendant, however, Lisa was neither arrested for nor charged with a violation of section 368(a).

We recognize there may be many reasons for choosing to prosecute one person but not to prosecute others who may appear to be similarly situated, not the least of which is the prudent expenditure of limited prosecutorial resources. Thus, an uneven application of the law is not *necessarily* a consequence of the statute's failure to provide any clear standard as to who is under a duty to prevent the infliction of pain or suffering on an elder. (Cf. *Pryor* v. *Municipal Court, supra,* 25 Cal.3d at p. 252.) What is apparent, however, is that, under the statute as broadly construed, officers and prosecutors might well be free to take their guidance not from any legislative mandate embodied in the statute, but rather, from their *own* notions of the proper legal obligation owed by a grown child to his or her aging parent. This lack of statutory guidance is at least potentially troublesome where, as here, regardless of any perceived *moral* obligation on defendant's part to protect her father from abuse, she cannot be held criminally liable for her failure to come to his aid in the absence of a corresponding legal duty. As one treatise has noted, although "[g]eneral principles of morals and ethics form a [large] part of the raw materials out of which law is made, . . . the boundaries are not identical." (Perkins & Boyce, Criminal Law, *supra,* Imputability, p. 660.)

In sum, contrary to constitutional requirements, neither the language nor subsequent judicial construction of section 368(a) provides adequate notice to those who may be under a duty to prevent the infliction of abuse on an elder. Moreover, the statute fails to provide a clear standard for those charged with enforcing the law. Although the selective prosecution of defendant does not conclusively demonstrate the presence of arbitrary or discriminatory enforcement of the statute, it arguably lends support to the view that the potential exists for such impermissible enforcement.

Nonetheless, the People argue that because section 368(a) has previously been construed as proscribing only "criminal negligence," the statute is not impermissibly vague. They contend that the requirement of criminal negligence provides the constitutionally required standard of conduct for all citizens as well as the standard of enforcement by police, prosecutors and juries.

The People correctly note that several courts have rejected constitutional challenges to section 368(a) by narrowly construing the statute as requiring proof of criminal negligence. (See *People* v. *Manis, supra,* 10 Cal.App.4th at p. 114; *People* v. *Superior Court (Holvey)* (1988) 205 Cal.App.3d 51, 60 [252 Cal.Rptr. 335].) As the court in *Manis* recognized, however, "criminal negligence only arises from a gross violation of an already existing duty of care . . . ." (10 Cal.App.4th at p. 114; cf. *People* v. *Montecino* (1944) 66

Cal.App.2d 85, 100 [152 P.2d 5] [death caused by negligent failure to perform legal duty of care toward helpless person is manslaughter].)[15]

Indeed, in *Manis*, the court expressly found that the defendant had assumed the duty of caring for her elderly mother. (*People* v. *Manis*, *supra*, 10 Cal.App.4th at p. 114.) Focusing on that portion of section 368(a) pertaining to those having the care or custody of an elder, the court concluded that "any definition of the word 'care' would include having in one's house a helpless relative, such as the victim, who could not feed herself due to Alzheimer's disease." (*People* v. *Manis*, *supra*, 10 Cal.App.4th at p. 117.)

Thus, *Manis* and *Holvey* demonstrate only that, by reading into section 368(a) the requirement of criminal negligence, the *standard of conduct* required by the statute can be made sufficiently certain. The requirement of criminal negligence, standing alone, however, does not remedy the uncertainty of section 368(a). It simply clarifies the standard by which to determine whether the duty to prevent elder abuse, once established, has been breached.[16]

The People next contend that *People* v. *Smith*, *supra*, 35 Cal.3d at page 810, and its progeny should be deemed controlling precedent on the constitutionality of section 368(a), and that principles of stare decisis compel us to follow those cases here. In *Smith*, the defendant challenged the constitutionality of section 273a, former subdivision (1) (now subd. (a)(1)), the felony child abuse statute substantially identical to section 368(a). She claimed that the phrase "unjustifiable physical pain or mental suffering" was impermissibly vague. (35 Cal.3d at p. 809.) We rejected her challenge, finding the statute "not so uncertain . . . as to render [it] invalid: [it] provide[s] both notice to those whose activities are proscribed and guidance for the courts called on to apply [it]." (*People* v. *Smith*, *supra*, 35 Cal.3d at p. 810.)

Thereafter, in *People* v. *Superior Court* (*Holvey*), *supra*, 205 Cal.App.3d at page 60, the court concluded that because *Smith* had held *all* of section 273a

---

[15]In several of the cases relied on by the dissent to support the assertion that the requirement of criminal negligence provides sufficient certainty to section 368(a), the question of duty is addressed separately, as an issue distinct from the question whether the defendant's conduct rises to the level of criminal negligence. (See, e.g., *People* v. *Oliver* (1989) 210 Cal.App.3d 138, 147 [258 Cal.Rptr. 138] [existence of special relationship created duty on manslaughter defendant to seek medical aid for victim]; see also *Williams* v. *Garcetti*, *supra*, 5 Cal.4th at pp. 570-572 [parental duty of supervision and control in child delinquency statute consistent with definition and limits of duty established in tort law].)

[16]We are not persuaded by dictum in *People* v. *Manis*, *supra*, 10 Cal.App.4th at page 114, that by construing the statute as reaching only criminal negligence, any uncertainty as to the statutory clause at issue here has been resolved. As discussed above, the *Manis* court found the defendant to be her mother's caretaker. The defendant's legal duty therefore arose from the express statutory language imposing a duty on those having the care or custody of an elder.

to be constitutional, and because section 368(a) mirrors the language of section 273a, former subdivision (1), it followed that the language of section 368(a), in its entirety, passes constitutional muster. (*People* v. *Superior Court (Holvey), supra,* 205 Cal.App.3d at p. 60; accord, *People* v. *Manis, supra,* 10 Cal.App.4th at p. 114.)

It is well settled that a decision is not authority for an issue not considered in the court's opinion. (See *People* v. *Myers* (1987) 43 Cal.3d 250, 265, fn. 5 [233 Cal.Rptr. 264, 729 P.2d 698]; *People* v. *Lonergan* (1990) 219 Cal.App.3d 82, 93 [267 Cal.Rptr. 887]). In *People* v. *Smith, supra,* 35 Cal.3d at page 810, we addressed the defendant's contention that the phrase "unjustifiable physical pain or mental suffering" did not provide an ascertainable standard of guilt. We did not, however, consider the issue presented here, concerning the language purporting to hold criminally liable any person who permits, in that case, any child, to suffer. *Smith* is, therefore, not dispositive.[17]

We have determined that the portion of section 368(a) purporting to impose on any person the duty to prevent the infliction of pain or suffering on an elder fails to meet the constitutional requirement of certainty. Before declaring a statute void for vagueness, however, we have an obligation to determine whether its validity can be preserved by "giv[ing] specific content to terms that might otherwise be unconstitutionally vague." (*Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, 598 [135 Cal.Rptr. 41, 557 P.2d 473]; see also *Pryor* v. *Municipal Court, supra,* 25 Cal.3d at p. 253; *Braxton* v. *Municipal Court* (1973) 10 Cal.3d 138, 145 [109 Cal.Rptr. 897, 514 P.2d 697] [listing cases in which we upheld a statute's constitutionality by rendering a restrictive interpretation].) Indeed, we cannot invalidate a statute as unconstitutionally vague if " 'any reasonable and practical construction can be given to its language.' " (*Walker* v. *Superior Court, supra,* 47 Cal.3d at p. 143; *Pryor* v. *Municipal Court, supra,* 25 Cal.3d at p. 253.)

As we shall explain, the constitutionally offensive portion of the statute is indeed susceptible of a clarifying construction, but not the one adopted by the Court of Appeal in this case.

The Court of Appeal acknowledged that because the information charged defendant with violating section 368(a) by her failure to act, she must first have been under a duty to act in order for criminal liability to attach. The

---

[17]We disapprove *People* v. *Superior Court (Holvey), supra,* 205 Cal.App.3d 51, and *People* v. *Manis, supra,* 10 Cal.App.4th 110, to the extent those cases hold that section 368(a) is facially constitutional without the curative construction set forth herein.

court found the existence of such a duty based on defendant's filial relationship to the decedent. Specifically, the court incorporated the statutory duty imposed on adult children to provide financial support for needy parents set forth in section 270c and, as they then existed, in Civil Code former sections 206 and 242.[18]

Section 270c, in relevant part, provides that "every adult child who, having the ability so to do, fails to provide necessary food, clothing, shelter, or medical attendance for an indigent parent, is guilty of a misdemeanor." Civil Code former section 206 imposed on the parents or *adult children* of "any person in need who is unable to maintain himself by work" the duty "to maintain such person to the extent of their ability." Civil Code former section 242 imposed a similar duty of support on spouses, parents and adult children under the Uniform Civil Liability for Support Act. The Court of Appeal read these financial support statutes broadly, characterizing the statutory duty imposed by them as one based on the special relationship between a parent in need and a child able to help. As we shall explain, however, in light of the fundamental distinction between the legislative purpose of the support statutes and that underlying section 368(a), the Court of Appeal's reliance on these statutes as the basis of defendant's duty toward her father seems misplaced.

█ The duty of adult children to provide support for needy parents is deeply rooted in our statutory law, and it is well established that the purpose of such legislation is " 'to protect the public from the burden of supporting people who have children able to support them.' " (*In re Jerald C.* (1984) 36 Cal.3d 1, 9-10 [201 Cal.Rptr. 342, 678 P.2d 917], quoting *Duffy* v. *Yordi* (1906) 149 Cal. 140, 142 [84 P. 838]; see also *Gluckman* v. *Gaines* (1968) 266 Cal.App.2d 52 [71 Cal.Rptr. 795] [main purpose of statutes providing needy parents with right of support is to protect public from burden of supporting those with children able to do so].) █ Such fiscal concerns are markedly different from the purpose underlying section 368(a). As previously noted, section 368(a) is intended to protect elders from physically abusive situations in which serious injury or death is likely to occur. (Cf.

---

[18]As of January 1, 1994, Civil Code sections 206 and 242 were repealed and reenacted as part of the new Family Code. (Stats. 1992, ch. 162, § 2, operative Jan. 1, 1994.) Family Code section 4400 restates without substantive change the first sentence of Civil Code former section 206 and Civil Code former section 242 pertaining to the duty of an adult child to support a parent. The provision in Civil Code former section 206 defining a parent who receives aid to the aged as one in need was omitted as obsolete. (See Welf. & Inst. Code, § 12350.) Thus, the statute reads "[e]xcept as otherwise provided by law, an adult child shall, to the extent of his or her ability, support a parent who is in need and unable to maintain himself or herself by work." (Fam. Code, § 4400.)

For purposes of discussion here, we will continue to refer to the statutes by their former Civil Code section numbers.

*People* v. *Jamarillo,* 98 Cal.App.3d at p. 835 [describing purpose underlying felony child abuse statute].)

In *Walker* v. *Superior Court, supra,* 47 Cal.3d at page 126 (hereafter *Walker*), we addressed the relationship between sections 270 and 273a, the child-focused counterparts to the financial support and felony abuse statutes at issue here. In that case, the defendant's daughter died of meningitis after the defendant prayed for her child's recovery rather than seeking medical attention. (*Walker, supra,* 47 Cal.3d at p. 119.) The defendant sought a dismissal of her prosecution for voluntary manslaughter and felony child abuse, arguing that because section 270, the child support statute, provided an exemption from prosecution for prayer in lieu of treatment, she was also exempt from prosecution for felony child abuse under section 273a. We rejected the defendant's contention, concluding that the two statutory schemes could not be construed together because the fiscal objectives of the child support statute were manifestly different from the specific purpose of the felony child abuse statute, i.e., to protect children from harm. (*Walker, supra,* 47 Cal.3d at p. 124.)

Similar to our conclusion in *Walker,* we find here that, because of the significant distinction in legislative purpose between the two statutory schemes, the financial support statutes cannot be relied on to clarify the scope of the felony elder abuse statute. We discern no reasonable basis on which to conclude that the probable intent of the Legislature was to equate the statutory duty of financial support with the duty to prevent physical harm triggering felony criminal liability under section 368(a).

Nor would the purpose underlying section 368(a) be furthered by such a construction. The Legislature enacted the felony elder abuse statute to ensure the protection of *all* elders, both indigent and financially secure, from abusive situations. Reliance on the financial support statutes as the basis of a duty to prevent the infliction of abuse on an elder would appear to exclude from statutory protection those who are not financially needy. The Court of Appeal's comment that infirm parents with means would presumably hire competent caretakers presupposes that only those unable to afford professional care are abused or neglected, an observation that is not supported by the evidence.

We thus find that the Court of Appeal's reliance on section 270c, and on Civil Code former sections 206 and 242 to conclude defendant owed a duty of care under section 368(a) was misplaced. Nor can such a duty be found in the legal relationship between defendant and the abused elder. Although at common law parents have long had a duty to care for and protect their minor

children (Perkins & Boyce, Criminal Law, *supra*, Imputability, at pp. 670-671; see *People* v. *Burden* (1977) 72 Cal.App.3d 603, 617 [140 Cal.Rptr. 282]), there is no corresponding common law obligation on adult children to protect and care for their aging parents.[19] (*Dept. of Mental Hygiene* v. *Kirchner* (1964) 60 Cal.2d 716 [36 Cal.Rptr. 488, 388 P.2d 720, 20 A.L.R.3d 353] [no duty at common law to support adult child or parent].)

Focusing on the defendant's legal relationship with the elder victim thus fails to yield a satisfactory construction of the statute. As we shall explain, however, a special relationship between the defendant and the person inflicting pain or suffering on the elder does provide the basis for a reasonable and practical interpretation of the statutory language at issue here. Under such a statutory construction, in order for criminal liability to arise for *permitting* an elder to suffer unjustifiable pain or suffering, a defendant must stand in a special relationship to the individual inflicting the abuse on the elder such that the defendant is under an existing duty to supervise and control that individual's conduct.

In the law of torts, as a general principle, one is under no legal duty to control another's conduct. (See *Davidson* v. *City of Westminster* (1982) 32 Cal.3d 197, 203 [185 Cal.Rptr. 252, 649 P.2d 894]; *Richards* v. *Stanley* (1954) 43 Cal.2d 60, 65 [271 P.2d 23].) An exception exists, however, if the defendant stands in a special relationship to the actor whose conduct needs controlling. (See *Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425, 435-436 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166]; see also *Megeff* v. *Doland* (1981) 123 Cal.App.3d 251, 257 [176 Cal.Rptr. 467]; Rest.2d Torts, § 315, subd. (a), p. 122.) Such a relationship, if established, may support an affirmative duty for the benefit of third persons. (*Tarasoff* v. *Regents of University of California*, *supra*, 17 Cal.3d at p. 436.)

The Restatement Second of Torts provides guidance as to both the nature and the scope of the special relationships that would give rise to a duty to prevent an individual from inflicting pain or suffering on an elder, pursuant to section 368(a). These special relationships are defined as those between (1) parent and minor child, (2) employer and employee, (3) landowner and licensee, and (4) "[o]ne who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled . . . ." (Rest.2d Torts, §§ 316-319, pp. 123-130.) Case law applying and refining the "duty to control" principles serves as a further guide to determining when, under section 368(a), an individual may be held criminally

---

[19]Although there are no common law crimes in this state (see § 6), we are free to look to the common law to supply the requisite certainty to an existing statute. (See *People* v. *Kelly* (1992) 1 Cal.4th 495, 534 [3 Cal.Rptr.2d 677, 822 P.2d 385].)

liable for the failure to control the conduct of an individual who inflicts pain or suffering on an elder. (See, e.g., *Williams* v. *Garcetti, supra,* 5 Cal.4th at p. 575 [parental duty to control minor children].)

For example, as to the individual who takes charge of a third person whom he or she knows or should know is likely to cause bodily harm to others if not controlled (Rest.2d Torts, § 319, pp. 128-130), under existing principles of tort law, in order for one to "take charge" of a person such that a legal duty to control his or her conduct is created, one must possess the *ability* to control. (*Megeff* v. *Doland, supra,* 123 Cal.App.3d at p. 261.) When such ability does not exist, no duty arises, rendering inactionable a civil claim against a defendant for the failure to control the conduct of another. (*Ibid.* [defendant adult daughter lacking ability to control conduct of abusive father]; see also *Wise* v. *Superior Court* (1990) 222 Cal.App.3d 1008, 1014 [272 Cal.Rptr. 222] [defendant wife lacked ability to control husband's violent conduct]; *Hansra* v. *Superior Court* (1992) 7 Cal.App.4th 630, 645 [9 Cal.Rptr.2d 216] [no facts alleged sufficient to show defendant mother and brother of violent individual had ability to control his behavior].) From this it follows that one will be *criminally* liable for the abusive conduct of another only if he or she has the *ability* to control such conduct. (Cf. *Williams* v. *Garcetti, supra,* 5 Cal.4th at p. 574.)

To construe section 368(a) as set forth above is reasonable in that it gives meaning to the specific statutory language at issue here, while at the same time it refrains from extending the reach of the statute in a manner that is unlikely to have been intended by the Legislature. Although, as so interpreted, the class of potential offenders may indeed be relatively small, it is one that is clearly not covered by that portion of the statute imposing a duty on caretakers and custodians to prevent injury or endangerment to their charge, no matter how broadly the terms "care" or "custody" are defined. (See Leonard, *Prosecuting Crimes Against Elders: A Guide for California Prosecutors* (1989) 12 Prosecutor's Brief 8 [elder abuse statute defines the term "caretaker" broadly].) For example, the parent found to be under a legal duty to supervise and control his or her child who, with criminal negligence,[20] fails to prevent the child from inflicting pain on an elder, is subject to criminal liability under section 368(a). Criminal liability in such a case is properly based not on the relationship between the defendant and the elder, but rather, on that between the defendant and the abuser.

---

[20]Finally, the interpretation we give to the statute is not only fully consistent with, but an integral component of, the judicially imposed requirement that liability under section 368(a) may only arise when the defendant's conduct is found to be criminally negligent. (See *People* v. *Manis, supra,* 10 Cal.App.4th at p. 114 [criminal negligence arises from gross violation of preexisting duty of care].)

The reasonableness of our construction of the statutory language is further supported by the structure of the statute itself. We previously noted that section 368(a) imposes felony criminal liability on any person who affirmatively causes or inflicts unjustifiable pain or suffering on an elder, as well as on anyone who permits the infliction of such abuse on an elder. Under this statutory language, the class of potential defendants includes both those who directly inflict the abuse as well as those who passively fail to act. It is appropriate, therefore, that the duty imposed on an individual to prevent abuse be of sufficient stature and seriousness to warrant the same potential for felony liability as that faced by the individual who directly inflicts or causes an elder to suffer unjustifiable pain or mental suffering.

Moreover, as noted earlier, the statutory scheme also provides that a *caretaker* or *custodian* who causes or permits injury or physical endangerment will incur criminal liability with a lesser degree of harm or potential harm to the victim. By limiting potential criminal liability for the failure to prevent abuse of an elder to those under an existing legal duty to control the conduct of the person inflicting the abuse, the apparent relationship of culpability to harm inherent in the statutory structure is both recognized and maintained.

The statutory certainty provided by the construction set forth herein conveys fair notice to those already under a legal duty to control the conduct of another that their failure to carry out such duty may trigger felony criminal liability in the event an elder is physically abused at the hands of their charge. Clarifying and narrowing the scope of the statute also reduces the possibility that it will be enforced in an arbitrary or discriminatory manner by providing a standard for police, prosecutors and courts as to who might be liable for a failure to prevent the infliction of abuse on an elder. Such a standard serves to diminish the potential for those charged with the enforcement of section 368(a) to rely on personal notions of legal duties, rather than those created by established legal principle. In light of these conclusions, we hold that, as construed, section 368(a) is not unconstitutionally vague.[21]

## III. DISPOSITION

Based on their status as Robert Heitzman's caretakers, felony criminal liability was properly imposed on Richard, Sr., and Jerry pursuant to section

---

[21]In light of the ruling here, we need not address defendant's suggestion that section 368(a) can be made more certain by reading into the statute a requirement that the defendant either have control of the premises where the abuse is being inflicted, or actually aid and abet the acts causing the suffering.

368(a) for the role they played in bringing about their father's demise. We observe that, had the events leading to Robert Heitzman's death occurred prior to the enactment of section 368(a), it is likely that prosecutors would have had great difficulty establishing a basis of criminal liability under which to successfully charge Richard, Sr., and Jerry. Because of this, and regardless of our disposition of defendant here, we believe the statute has well served its intended purpose in this distressing case.

Furthermore, given defendant's failure to intercede on her father's behalf under the egregious circumstances presented here, we can well understand the prosecution's decision to charge defendant under section 368(a). Because the People presented no evidence tending to show that defendant had a *legal duty* to control the conduct of either of her brothers, however, we reverse the judgment of the Court of Appeal with directions to reinstate the trial court's order dismissing the charges against defendant.[22]

We emphasize that our disposition of this case in no way signifies our approval of defendant's failure to repel the threat to her father's well-being. The facts underlying this case are indeed troubling, and defendant's alleged indifference to the suffering of her father cannot be condoned. The desire to impose criminal liability on *this* defendant cannot be accomplished, however, at the expense of providing constitutionally required clarity to an otherwise vague statute.

The judgment of the Court of Appeal is reversed.

Kennard, J., Arabian, J., and George, J., concurred.

**BAXTER, J.**—I respectfully dissent. The majority essentially holds that even though defendant knew her aged and disabled father was living in her brothers' home under conditions that were painful, degrading, and ultimately fatal, she cannot be criminally prosecuted for her failure to act because she did not stand in a "special relationship" with either her father or her brothers under *tort* law. The majority suggests that its decision to engraft a special relationship requirement onto the elder abuse statute charged in this case is consistent with the underlying legislative intent. (Pen. Code, § 368.)[1] The majority further claims such a construction is necessary to avoid invalidation of the statute under the due process clauses of the federal and state Constitutions.

---

[22]The prosecution is, of course, free to refile charges against defendant, subject to the dictates of section 1387.

[1]All further statutory references are to the Penal Code except as otherwise stated. Like the majority, I will refer to section 368 as an elder abuse statute even though its protections also extend to "dependent adults." There is no dispute that the victim in this case fits the statutory definition of an "elder"—"any person who is 65 years of age or older." (§ 368, subd. (d).)

I disagree with both propositions. First, as argued by the People in this case, the language and history of section 368 and the child abuse statute on which it was based (§ 273a) indicate that both statutes apply to *any* person who is guilty of *criminal* negligence under the particular circumstances. The majority's special relationship requirement appears to dishonor this clear intent. Second, it is not necessary for the majority to construe the statute in so limited and unusual a fashion in order to satisfy the demands of either procedural or substantive due process. As our recent decisions make clear, the criminal negligence standard is stringent, clear, and constitutional. By targeting only those persons guilty of gross and criminal neglect, section 368 is not uncertain, arbitrary, or unreasonable in defining either the offenders or the offenses to which it applies.

Based on the preliminary hearing record in this case, there was ample evidence that defendant's failure to intervene in her father's behalf was criminally negligent, and thus violated section 368. Unlike the majority, I would therefore affirm the judgment of the Court of Appeal insofar as it reversed the superior court's dismissal of criminal charges against defendant.

Distilled, the elder abuse statute imposes felony criminal liability for particular injurious acts or omissions by persons having *care or custody* of an elder, but it *also* punishes as a felon "[a]ny person" who "inflicts . . . unjustifiable physical pain or mental suffering" upon an elder under circumstances "likely to produce great bodily harm or death," or who "willfully causes *or permits*" such suffering to occur "with knowledge" that the victim is an elder. (§ 368, subd. (a), italics added.) As noted by the majority, the case against defendant implicates the statute only insofar it applies to "any person" who "permits" an elder to suffer serious, unjustifiable pain or suffering.[2]

The majority insists the "[a]ny person who . . . permits" language cannot itself be read to impose a duty to act against elder abuse because the Legislature gave no clue as to the "class" of persons who owe such a duty. (Maj. opn., *ante*, at p. 205.) The majority's basic theory is that the statutory

---

[2]Section 368, subdivision (a) states in full, "Any person who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any elder or dependent adult, with knowledge that he or she is an elder or a dependent adult, to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any elder or dependent adult, willfully causes or permits the person or health of the elder or dependent adult to be injured, or willfully causes or permits the elder or dependent adult to be placed in a situation such that his or her person or health is endangered, is punishable by imprisonment in the county jail not exceeding one year, or in the state prison for two, three, or four years." Subdivision (b) imposes misdemeanor liability where similar misconduct is committed under circumstances "other than" those likely to produce great bodily harm or death.

scheme and legislative history are "silent" concerning those individuals who, besides caretakers and custodians, are required to prevent the infliction of elder abuse. (Maj. opn., *ante*, at p. 204.)

As a result, the majority reaches out to the common law of torts in order to define the class of noncaretakers whose injurious failures to act may constitute felonies under section 368. The majority adopts the following rule: "[I]n order for criminal liability to arise for permitting an elder to suffer unjustifiable pain or suffering, a defendant must stand in a special relationship to the individual inflicting the abuse on the elder such that the defendant is under an existing duty to supervise and control that individual's conduct." (Maj. opn., *ante*, at p. 212, italics omitted.) According to my colleagues, no other plausible construction of section 368 exists.

I disagree. The "class" of offenders is clear on the face of section 368. By its own terms, the statute applies to "any person" who commits the misconduct described therein. The quoted phrase is specific, unambiguous, and subject to no construction "other than a literal one." (*In re James P.* (1981) 115 Cal.App.3d 681, 685 [171 Cal.Rptr. 466].)

Indeed, *most* criminal statutes apply either expressly or by implication to all persons who commit the proscribed act. The majority cites no authority for its assumption that the "any person" formulation is ambiguous or impermissible simply because the statute involves a culpable omission instead of an affirmative act. In other words, I see no reason to disregard the Legislature's clear intent, unambiguously expressed, that "[*a*]*ny* person" can violate section 368 if he permits abuse of an elder under the circumstances contemplated by the statute. (Italics added.)

The majority's rejection of a literal interpretation of the "any person" language also seems to have far-reaching implications. Contrary to what the majority implies, penal statutes that impose duties to act, and punish inaction, are common. (1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Elements of Crime, §§ 115-116, pp. 135-137; see, e.g., §§ 270, 270a, 270c, 271a, 272 [duties among family members].) It is particularly important to note that section 368 is not the only statute making it a crime for "any" and all persons to willfully or knowingly "permit" or "allow" a specified wrong to occur. (See, e.g., Bus. & Prof. Code, § 4992.7 [licensing fraud]; Elec. Code, § 29200 [unlawful voter registration]; Fin. Code, § 5307 [false business rumors]; Pen. Code, §§ 273a [child endangerment], 280 [child concealment], 588 [injury to roadways].) I am concerned that the majority opinion undermines such statutes to the extent they cannot be "saved" by a "special relationship" requirement similar to the one engrafted onto section 368.

The majority's limited construction of the "class" of persons to whom the statute applies is inappropriate and unnecessary for another compelling reason. Specifically, there is persuasive evidence that the Legislature intended to punish only those "persons" in the world at large whose harmful omissions constitute criminally negligent behavior. As I will explain below, the construction the Legislature intended to adopt under section 368 is entirely consistent with the demands of procedural and substantive due process.

Critical to this analysis is section 273a, which defines the crime of child endangerment. Section 273a was enacted in 1905 and has remained substantially unchanged over the years.[3]

As noted by the majority, the Legislature incorporated the language of section 273a almost "verbatim" into section 368 when the latter statute was enacted in 1983. (Maj. opn., *ante*, at p. 204.) The legislative history indicates that both provisions are intended to protect individuals who, because of age or dependency, are the most vulnerable to abuse and neglect. (See maj. opn., *ante*, at pp. 202-204.)

What the majority fails to make clear is that even before enactment of section 368, section 273a had been construed in a manner consistent with the People's position in this case. Under this view, the relevant statutory language imposes a general duty to intervene where failure to do so would be criminally negligent. (*People v. Lee* (1991) 234 Cal.App.3d 1214, 1221 [286 Cal.Rptr. 117]; *People v. Rippberger* (1991) 231 Cal.App.3d 1667, 1682 [283 Cal.Rptr. 111]; *People v. Odom* (1991) 226 Cal.App.3d 1028, 1032 [277 Cal.Rptr. 265]; *People v. Pointer* (1984) 151 Cal.App.3d 1128, 1134 [199 Cal.Rptr. 357]; *People v. Hernandez* (1980) 111 Cal.App.3d 888, 895 [168 Cal.Rptr. 898]; *People v. Atkins* (1975) 53 Cal.App.3d 348, 361 [125 Cal.Rptr. 855]; *People v. Peabody* (1975) 46 Cal.App.3d 43, 46-49 [119 Cal.Rptr. 780]; CALJIC No. 9.37 (1989 rev.) [§ 273a felony instructions].)

This construction of section 273a is based on the following rationale: the statute literally applies where the defendant "willfully causes or permits" the proscribed harm. In general, an act is "willful" where it is purposefully or intentionally performed. No intent to violate the law or cause injury is

---

[3]Section 273a, subdivision (a)(1) provides, "Any person who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or willfully causes or permits that child to be placed in such a situation that its person or health is endangered, is punishable by imprisonment in a county jail not exceeding one year, or in the state prison for 2, 4, or 6 years."

required. (§ 7; *People* v. *Peabody, supra,* 46 Cal.App.3d 43, 46.) However, the Legislature could not have intended to punish every "willful" omission or conscious act of "permitting" abuse. Such a construction would not meaningfully distinguish between those omissions that are sufficiently culpable to warrant criminal liability and those that are not. Because the act of "permitting" abuse is otherwise unmodified, the Legislature must have intended to impose a criminal negligence requirement. (*Peabody,* at pp. 46-48.) This conclusion flows from the general notion that every crime involves either a culpable mental state or criminal negligence. (§ 20.) Because no culpable mental state is specified and because there is no indication the Legislature intended to dispense with the dictates of section 20, only those omissions involving criminal negligence are proscribed by section 273a. (*People* v. *Peabody, supra,* 46 Cal.App.3d 43, 46.)

The Legislature presumably was aware of the "*Peabody* rule" at the time section 368 was enacted. We can only infer that the Legislature intended to adopt this construction of section 273a when it framed section 368 in identical language. (*People* v. *Harrison* (1989) 48 Cal.3d 321, 329 [256 Cal.Rptr. 401, 768 P.2d 1078].) Thus, a noncaretaker's violation of section 368 must be deemed to occur only when, as a result of criminal negligence, the defendant permits an elder to suffer unjustifiable pain under dangerous or life threatening circumstances. (Accord, *People* v. *Manis* (1992) 10 Cal.App.4th 110, 114 [12 Cal.Rptr.2d 619]; *People* v. *Superior Court (Holvey)* (1988) 205 Cal.App.3d 51, 60 [252 Cal.Rptr. 335]; CALJIC No. 9.38 (1994 new) [§ 368 felony instructions].)

The majority rejects this construction. The majority concludes that even assuming section 368 contains a criminal negligence requirement, the statute still does not adequately define the targeted class. (See maj. opn., *ante,* at p. 207.) Although the majority opinion emphasizes "fair notice" and other procedural concerns, it also implies that the statute violates *substantive* due process if it is not read to require a "special relationship" between the defendant and the abuser.[4] Whatever the precise nature of the majority's constitutional complaint, I see no facial flaw in the statute.

As construed to contain a criminal negligence requirement, section 368 sets forth a standard of conduct that is rigorous and certain. Although the

---

[4]This implication appears in the majority's claim that section 368 otherwise casts too "wide" a "net" and applies to individuals whose failure to act cannot rationally be defined as criminal. (Maj. opn., *ante,* at p. 200.) However, as I will explain, the statute only applies where the lapse constitutes a "gross" departure from the standard of conduct that can reasonably be expected in a civilized society, and where there is unjustifiable human suffering and a high risk of death or harm. I see nothing "arbitrary" or "capricious" in such a law. (*Coleman* v. *Department of Personnel Administration* (1991) 52 Cal.3d 1102, 1125 [278 Cal.Rptr. 346, 805 P.2d 300].)

majority does not emphasize the point, "ordinary" negligence will not suffice. Specifically, criminal negligence involves " 'a higher degree of negligence than is required to establish negligent default on a mere civil issue. The negligence must be aggravated, culpable, gross, or reckless, that is, the conduct of the accused must be such a departure from what would be the conduct of an ordinarily prudent or careful [person] under the same circumstances as to be incompatible with a proper regard for human life . . . or an indifference to consequences.' " (*People* v. *Penny* (1955) 44 Cal.2d 861, 879 [285 P.2d 926]; accord, *People* v. *Peabody, supra,* 46 Cal.App.3d 43, 47.)

We have held, for instance, that proof of criminal negligence is necessary in determining whether a deadly act or omission constitutes involuntary manslaughter (§ 192, subd. (b); *People* v. *Penny, supra,* 44 Cal.2d 861, 879-880; see also *People* v. *Oliver* (1989) 210 Cal.App.3d 138, 146-150 [258 Cal.Rptr. 138]), whether parents have violated their statutory duty of care and control over a minor child (§ 272; *Williams* v. *Garcetti* (1993) 5 Cal.4th 561, 573 [20 Cal.Rptr.2d 341, 853 P.2d 507] (*Williams*)), and whether the defendant has unlawfully permitted a child to suffer harm (§ 273a; *Walker* v. *Superior Court* (1988) 47 Cal.3d 112, 134-135 [253 Cal.Rptr. 1, 763 P.2d 852] (*Walker*), approving *People* v. *Peabody, supra,* 46 Cal.App.3d 43, 47.)

More importantly, our construction of each of these penal statutes makes clear that the criminal negligence standard is not vague or unreasonable.

On the one hand, *Williams, supra,* 5 Cal.4th 561, upheld section 272 against a vagueness challenge primarily *because* violation of the statute required proof of criminal negligence. Specifically, the plaintiffs in *Williams* complained that the statute did adequately apprise parents of the acts that must be performed in order to fulfill their statutory duty of "reasonable" control over a minor child. The plaintiffs also argued that section 272 might be read to impose criminal liability on parents who did not know that their child was a delinquency risk or who tried but failed to control the child.

In rejecting the claim, we emphasized that breach of the statutory duty could be found only where the "heightened requirements" of criminal negligence had been met under the particular circumstances. (*Williams, supra,* 5 Cal.4th 561, 574.) *Williams* observed that "there can be no criminal negligence without actual or constructive knowledge of the risk," and that parents who "reasonably try but are unable to control their children are not criminally negligent." (*Ibid.*)

On the other hand, *Walker, supra,* 47 Cal.3d 112 makes clear that the criminal negligence standard is not itself unconstitutionally vague. In

*Walker,* the defendant was charged with involuntary manslaughter and child endangerment because her sick daughter died after receiving prayer in lieu of medical treatment. Defendant claimed that notwithstanding a criminal negligence requirement, both statutes did not provide fair warning of the "point" at which lawful prayer treatment becomes unlawful. We rejected the claim. " '[T]he law is full of instances where [the defendant's] fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree.' . . . The 'matter of degree' that persons relying on prayer treatment must estimate rightly is the point at which their course of conduct becomes criminally negligent. In terms of notice, due process requires no more." (*Id.* at p. 142.)

Cases involving child and elder abuse leave no uncertainty as to the circumstances under which the failure to act is unlawful. All of the following factors are typically present: defendant's knowledge that the victim required urgent medical attention or other vital assistance (*Walker, supra,* 47 Cal.3d 112, 137; *People v. Atkins, supra,* 53 Cal.App.3d 348, 360); a high probability that the victim would suffer serious injury or death if such attention was not provided (*People v. Chavez* (1947) 77 Cal.App.2d 621, 628-629 [176 P.2d 92]; *People v. Villalobos* (1962) 208 Cal.App.2d 321, 328 [25 Cal.Rptr. 111]); the defendant's prolonged or inexcusable delay in failing to act despite his knowledge of the victim's dire state (*People v. Manis, supra,* 10 Cal.App.4th 110, 114; *People v. McKelvey* (1991) 230 Cal.App.3d 399, 404-405 [281 Cal.Rptr. 359]); demonstration by the defendant of an intent or willingness to allow the victim to suffer (*People v. Hernandez, supra,* 111 Cal.App.3d 888, 894-895); and existence of a reasonable opportunity to provide assistance, including lack of resistance from either the victim or third parties (*Williams, supra,* 5 Cal.4th 561, 574; *People v. Manis, supra,* 10 Cal.App.4th 110, 115).

Thus, as judicially construed, section 368 seeks to deter and punish only those persons who "permit" elder abuse under criminally negligent and dangerous circumstances. Defendants are on notice of this construction and of the factual situations in which liability typically has been found. (*Walker, supra,* 47 Cal.3d 112, 143.) For these reasons, I disagree with the majority's conclusion that section 368 does not define the "class" of offenders in sufficiently clear or narrow terms.

The majority nonetheless suggests that, absent a special relationship requirement, the statute might be *applied* in a manner that is unreasonable or fundamentally unfair. The majority expresses concern for the "delivery person who, having entered a private home, notices an elder in a disheveled or disoriented state and purposefully fails to intervene." (Maj. opn., *ante,* at

p. 200.) I assume the majority is similarly concerned about bystander liability under section 273a where the abused victim is a child.

However, no reasonable prosecutor or juror properly apprised of the law would conclude that sections 273a and 368 apply in so marginal a case. As noted earlier, criminal negligence is generally found only where the defendant's failure to act is egregious for a variety of reasons, including full knowledge of the victim's suffering and a repeated or prolonged refusal to assist the victim. In addition, my review of the case law indicates that individuals charged and convicted under sections 273a and 368 are typically caretakers or family members involved in an abusive situation on a close and ongoing basis. Although such a close relationship is not statutorily required, I am aware of no case in which a mere passerby, casual acquaintance, or temporary household visitor was subjected to criminal liability simply because he or she was aware of possible elder or child abuse. Indeed, the courts have assumed that the criminal negligence requirement precludes such a result under section 368. (*People* v. *Manis, supra,* 10 Cal.App.4th 110, 114.)

In any event, we do not invalidate a statute simply because " 'difficulty is found in determining whether certain marginal offenses' " fall within its grasp. (*Williams, supra,* 5 Cal.4th 561, 573.) Whatever the result of applying section 368 in another case, the magistrate in this case correctly found probable cause to believe defendant was criminally negligent.

In brief, the preliminary hearing record indicates that defendant—formerly her father's caretaker—knew he was paralyzed, incontinent, and completely dependent upon others to feed, clean, and move him. For a period of at least six weeks before her father died, defendant repeatedly visited and spent the night in the home where her brothers and father lived. Defendant had actual knowledge during this time that her father required, but did not receive, medical attention; that his person and physical surroundings had become filthy from human waste and debris; that the mattress from which he could not move without assistance was damp and rotted through; and that he was confined alone in his room for long stretches of time.

Nevertheless, defendant did not take *any* steps to assist her father during this period. She did not attempt to obtain professional help (e.g., telephoning the doctor, social worker, or paramedics); to care for him while present in the home (e.g., feeding or cleaning him); or to discuss with other family members the possibility of making different care arrangements (e.g., hospitalization or professional caretaking assistance). The evidence further discloses that defendant's father died as a result of the deplorable conditions of which defendant was actually or presumably aware (septic shock from bed sores, malnutrition, and dehydration).

In light of the foregoing, I would affirm the judgment of the Court of Appeal insofar as it reversed the superior court's order sustaining defendant's demurrer and dismissing the case.

Mosk, J., and Werdegar, J., concurred.