Filed 8/16/16  P. v. Phillips CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>DARRYL KEITH PHILLIPS,<br><br>        Defendant and Appellant. | A142990<br><br>(San Mateo County<br>Super. Ct. No. SC079372A) |

Darryl Keith Phillips began a relationship with retired schoolteacher Janice Lacy, then isolated her from her family, took control of her financial affairs, and failed to ensure she received medical treatment for her diabetes.  When police investigated, Phillips claimed he had power of attorney to make decisions and speak for Janice.[1]  After living with Phillips for three years, Janice was found in a profoundly demented mental state and suffering from life-threatening high blood sugar.  Phillips was convicted by a jury of elder abuse and preparation of false evidence for use in an official inquiry.  He argues his convictions are not supported by sufficient evidence.  We affirm the convictions but correct a conceded error in the calculation of Phillips's presentence custody credits.

---

[1] For simplicity and clarity, first names are used for persons who share the same surname with others involved in this case.

# I.  BACKGROUND

In a November 2013 information, Phillips was charged with felony elder abuse (Pen. Code, § 368, subd. (b)(1)),[2] felony falsification of a document to be used in evidence (§ 134), and misdemeanor obstruction of an officer in the course of her duties (§ 148, subd. (a)(1)).  It was alleged he had five prior felony convictions within the meaning of section 1203, subdivision (e)(4), three prior felony convictions within the meaning of section 1170.12, subdivision (c)(2), and had served a prior prison term within the meaning of section 667.5, subdivision (b).

The following evidence was presented at trial.  As of the summer of 2010, Janice was a retired home economics teacher living independently in her Menlo Park home.  She had close and loving relationships with her four children and their families, who visited Janice regularly, and gathered at Janice's home to celebrate holidays.  In June 2009, Janice's daughter, Nichelle, and Nichelle's children moved in with Janice, and they lived together harmoniously.  Janice managed her own affairs, including cooking, driving, shopping, house cleaning, bill paying, and her personal hygiene.  She had been diagnosed hypertension in 1998 and with diabetes in 2002, but her condition was "very well controlled" with prescription medications.

In August 2010, Janice met Phillips.  Phillips, who had been homeless, moved into Janice's home three or four days later, staying in Janice's bedroom.  Janice's son, Billy, described his first encounter with Phillips as "real eerie."  Nichelle said Phillips made her feel "[u]ncomfortable, unsettling, mysterious," and he had made no effort to speak to her or her two daughters while in Janice's home.  Shortly after Labor Day 2010, the four siblings met with Janice at her house to express their concerns.  Janice "basically said that she would think about things and she'll let us know and . . . we're all adults and it's really her business."

In November 2010, Phillips posted a three-day notice of eviction on Nichelle's bedroom door, but Janice tore it up.  In December 2010, when Nichelle was home sick,

---

[2] Undesignated statutory references are to the Penal Code.

he gave her another eviction notice and argued with her. Nichelle got help from a legal aid agency and offered in a letter to move out by March, but she found the letter "taped on [her] bedroom door saying 'no' in big letters." During a subsequent unlawful detainer court hearing, the judge asked Janice if she agreed with a proposed move-out date and Janice looked at Phillips. When the judge told her not to look to Phillips for guidance, Janice was unable to answer the judge's question. When Nichelle moved out in February 2011, Phillips was hostile, tried to start a fight with one of her friends, and called the police to falsely accuse Nichelle of trying to stab him.

After moving out, Nichelle could not call Janice because Phillips had turned off the home phone and taken away Janice's cell phone. She could not go to Janice's house because the court had ordered her not to return. At one point, Nichelle received a letter from Janice that was obviously written by someone else (based on spelling and other errors) that was "like a promissory note to give her money and she'll give us money."

Janice turned 65 in November 2011. Nichelle saw Janice at a family gathering in 2012 or 2013, and Janice "wasn't able to keep up the conversation. She would always ask questions after we [made] a statement."

Janice's son, Billy, visited Janice's house once or twice a week from 2010 through 2013. Janice was always in a back room. Billy "could kind of tell [Janice] wasn't taking her medicine because she . . . couldn't remember." She was no longer able to carry on a conversation and repeatedly asked the same question. She was also losing weight, and her condition continued to deteriorate over time. After Nichelle moved out, the property fell into disrepair. The grass had died, bushes were overgrown, and the inside of the house was a cluttered mess, all of which was a stark change from the property's prior condition. Eventually, surveillance cameras were installed "everywhere." Phillips became "[v]ery controlling" and did not want visitors. He and Janice sometimes talked to Billy through the window rather than opening the front door.

When Janice's daughter, Karen, visited after Labor Day 2010, Phillips always remained in sight and the interaction between Janice and Karen was very limited, with Janice answering yes or no to Karen's questions. Janice almost never wanted to go out

3

with Karen. When Karen visited, "it got to the point where I was waiting outside . . . anywhere from 20 to 30 minutes before I was . . . let in." Phillips became very aggressive, acting like he did not want Karen to see her mother, and Janice was very passive toward Phillips. Janice showed lapses in memory and became more confused over time.[3] When Karen asked if Janice had been to a doctor recently, Janice said it was none of Karen's business.

At a June 2012 family event, Karen and Janice made a plan to visit Janice's sister in Fresno the following August. Karen sent Janice a letter reminding her of the plan, but when Karen arrived at Janice's house Janice was not prepared and said she could not go on the trip. Karen convinced her to go and reminded her to pack her medicine. In Fresno, Janice told Karen she was not taking any medicine. She repeatedly seemed confused. After the trip, Karen reported the situation to Adult Protective Services (APS). On August 13, 2012, APS social worker Susann Woods went to Janice's house for a welfare check. Janice would not let Woods in the house. Woods could see the house was messy and cluttered, but she did not detect any health or safety hazards. Janice did not seem frail, fearful, demented, or dirty, and she said she was fine and did not need help. Janice said she lived alone, drove, shopped, and managed her own money. Woods closed the case.

After the August 2012 trip, Karen was no longer allowed in the house and was unable to talk to Janice, even through the window or by phone. Karen continued to write to Janice, but she never received a response or any evidence that Janice had received the letters.

In August 2013, Billy went to Janice's house to take Janice to see a doctor. Phillips told Billy he could not see her. Billy called the local police and three officers came to the home and knocked on the front door. Phillips said from a window they could not "see my wife" and should get off "my property." Janice never came out of the house,

---

[3] Nichelle's, Billy's and Karen's descriptions of Janice's mental deterioration and Phillips's efforts to isolate Janice were corroborated by Billy's girlfriend and a former student of Janice's who regularly visited her.

4

but Billy saw her through a window. The police notified APS about the incident. Karen had also contacted police and APS in September to report her concerns about Janice. APS social worker Gwyn Luong made an unannounced visit to Janice's home. Phillips answered the door and identified himself as Janice's husband. He said Janice's children were "after the house" and the police had already visited and everything was fine. He said Janice was asleep, but after Luong persisted he brought Janice to the door. Janice stood behind Phillips at the door, which was "very, very slightly ajar." When Luong asked how Janice was, Phillips told Janice to say she was fine and Janice said she was fine. Luong asked Phillips to let Janice speak for herself, but he continued to do all the talking. Luong asked to speak to Janice alone, but Phillips refused. Phillips and Janice declined all help and closed the door.

On Friday, October 4, 2013, at 1:30 p.m., Luong returned to Janice's home with Menlo Park Police Officer Felicia Byars and another officer. A videorecording of the encounter was played for the jury. Phillips again answered the door and refused to let them inside because "we" did not want them there. He was very defensive, asking for the officers' names and badge numbers. Eventually, he brought Janice to the door, but she stood behind him and he repeatedly said she did not want to talk to the officers or Luong. Phillips claimed Janice was his wife and he had power of attorney, which allowed him to speak for her. However, he refused to show any documentation. At Phillips's prompting, Janice told the officers she did not want to talk to them. Byars asked to speak to Janice alone but was never able to do so. Phillips was loud and confrontational, and he continually interrupted. He prompted Janice to make specific statements, encouraged her not to cooperate, urged her to assert her Fifth Amendment rights and demand a lawyer during questioning, and kept insisting that Janice did not want to talk.

With Phillips by her side, Janice said she did not have any problem with Phillips and was not afraid of him. Luong asked Janice to tell her Phillips's name and Janice drew a blank until Phillips told her, "Darryl Phillips." When again asked for Phillips's name, Janice did not answer as Phillips kept interrupting. Byars asked Janice about her diabetes and Phillips interrupted, saying Janice did not have diabetes and did not need a

5

doctor. Byars asked Janice to call her children, and Phillips said that Janice wanted her children to leave her alone because they were living off of her. Janice eventually said, "They're not my kids," but Byars and Luong were not able to get her to explain what she meant as Phillips kept interrupting. At Phillips's prompting, Janice said she did not want to talk any longer. The visit ended and the officers said they would return with a search warrant. Luong testified that Janice did not seem to understand what was going on, and Luong was concerned that Janice's memory was impaired. Byars, who was qualified as an expert in elder abuse and related financial crimes, felt she was not able to effectively evaluate Janice's condition based on the encounter.

Later in the afternoon of October 4, 2013, Phillips and Janice went to a notary public to have a power of attorney form notarized. The notary noticed the document had blank areas. Phillips directed Janice to write her initials and other information at designated spots on the form, which Janice did and then signed the document. After the notary prepared and attached the notarization form, she noticed the name typed under Janice's signature did not match the name on Janice's driver's license (the name typed under the signature line included the last name of Janice's second husband). Phillips crossed out the discrepancy, picked up the document with the notary form attached, and abruptly left the store.

On Saturday, October 5, 2013, Byars returned to Janice's house with other officers, placed Phillips under arrest, and assessed Janice's condition with the help of paramedics. Janice could not reliably state her birthdate, age or address. She acknowledged she had diabetes and was not taking any medication. Janice said she did not see her children because they "sort of are not what they . . . used to be . . . . [I]t's been a long time." She said, "[T]hey wanted to take up, I think, take up some of my little, little, I don't know, what can I call it? They didn't like the, the idea of it, so, so . . . ." She said Phillips's name was "Dale." She did not know how long Phillips had lived with her, what day or year it was, or who the president was. A paramedic determined that Janice's blood sugar level was 377—a dangerously high level that can cause altered mental states and organ damage. She also had high blood pressure

6

(160 over 98). Byars determined that Janice was not cognitively able to make her own decisions and took her into protective custody as a gravely disabled person. In the ambulance, Janice's blood sugar was measured at 590, which is life-threatening. Janice was unable to say how many siblings, daughters or grandchildren she had, and she could not draw a simple picture of a clock. She was admitted to the hospital to get her blood sugar and blood pressure under control.

At Phillips's request, Byars retrieved the power of attorney form from inside Janice's house. The document showed it was printed from the email account of "99darr@live.com" at 3:12 p.m. on October 4, 2013. Byars later interviewed Phillips at the police station. A videorecording of the interview was played for the jury. Phillips repeatedly insisted he obtained the power of attorney form before Byar and Luong came by on October 4, but he declined to sign a statement to that effect under penalty of perjury. Phillips acknowledged Janice had memory problems—"she doesn't remember anything"—and said he took care of paying her bills and cooking her meals. When asked if it was correct that he was "assuming responsibility for her as a caretaker," Phillips responded "correct" and "totally." Phillips again asserted he had power of attorney for Janice and said, "Durable power of attorney means that I do the thinking for her." After he was told he would be charged with elder abuse based on Janice's medical condition, however, Phillips said he was in charge of Janice's finances but not her medical care. He also claimed that Janice had no medical issues. He acknowledged she was not taking any medication and had not seen a doctor in three years. Phillips said Janice was not diabetic "irregardless what the doctor says." He knew she was not diabetic because he did not see any symptoms of sickness in her such as coughing. Her high blood sugar was not a problem because she exercised regularly, and not taking medication did not affect her. Phillips acknowledged he and Janice had a sexual relationship. He called her his common law wife and said they loved each other even if she could not remember his name. Phillips said he had "kicked all her mooching ass family out" of Janice's home. Byars noted that she had found mortgage information in the house and asked if Phillips was trying to sell the home. He was evasive at first, but when Byars confirmed she was

7

videotaping the interview, he said, "Okay then, no I'm not." When Byars asked if Janice used her credit cards or the computer, Phillips said it was none of her business.

Several medical professionals examined Janice in the hospital and determined she had severe dementia that could be attributed to her high blood sugar levels. Tests showed that Janice's "average glucose on a daily basis was around 350. The . . . fasting blood sugar should be no higher than 120. So that means she was living in a persistently elevated blood glucose level and there are many . . . ill effects of that over time." On one cognitive assessment test, Janice scored 3 out of 30, with a score of 27 or higher considered normal. After she was released from the hospital to live with family members, Janice was "[n]ot able to do pretty much anything for herself. . . . She wears pull-ups. . . . You have to help her with showers because she don't know what to do. You have to tell her when to brush her teeth or how to do it. She basically can't provide for herself anymore." Janice last picked up her medication in December 2011, and one provider opined that she "became rapidly and profoundly demented" thereafter: "[W]e will never know at what point it became . . . so severe, but it appears . . . she did not have the ability to make . . . decisions" required for understanding legal documents.

Before Phillips moved in, Janice never used an ATM or her debit card or made online financial transactions; she paid her mortgage and bills on time; and she withdrew about $200–300 per month in cash. After Phillips moved in, she started making large ATM cash withdrawals, debit card purchases and online payments; she started missing mortgage payments; and her checking account was often overdrawn. A locked briefcase full of pre-signed checks was found in Janice's house. Janice's medical, vision and dental benefits were cancelled on her request (apparently by Phillips) in 2012, resulting in increased monthly retirement payments. Requests were also made in Janice's name to cash out her retirement annuity and pension. In an online transaction involving the "99darr@live.com" email account, her designated death beneficiary was changed from one of her children to Phillips.

Juanita Sanders, then 72 years old, testified that she began a relationship with Phillips in 2001, and he moved into her Menlo Park home in 2003. Prior to that time,

Sanders had a good relationship with her daughters, whom she saw regularly. Phillips eventually became "very controlling." He did not want Sanders to go outside, he withheld some of her mail, and he would not let her children visit. "They could be standing outside. [¶] . . .[¶] But he would not let them in." Phillips had an electronic gate installed at the house and did not give Sanders the password to open it. Phillips persuaded her to take out a loan against her house to make some minor repairs and upgrades. Sanders signed documents Phillips gave her without understanding them fully or being able to read them because she was legally blind. She later learned that the loan payments exceeded her retirement income. Phillips spent some of the loan money on business ventures that were not profitable and apparently opened a stock trading account in her name. Sanders repeatedly asked Phillips to leave, but he refused and would get angry with her. On occasions, he grabbed her head, butted her forehead with his, and bit her cheek. When Sanders finally called the police, and Phillips told her she had received a three-day notice to quit the premises because she had defaulted on her mortgage and the home was in foreclosure. Sanders moved in with her daughter, but Phillips remained in the house five more months, changed the locks, and kept most of Sanders's belongings.

A jury convicted Phillips on all counts. In a bifurcated proceeding, the jury found the prior strike allegations true. The court struck two of the prior strikes and sentenced Phillips to a total prison term of nine years four months, including the upper term of four years for elder abuse doubled based on a prior serious or violent felony conviction (§ 1170.12, subdivision (c)(1)), a consecutive 16-month term (one-third the middle) for preparation of false evidence, and credit for time served on the section 148 conviction.

## II. DISCUSSION

A. *Care and Custody*

Phillips argues there was insufficient evidence he had "care and custody" of Janice for purposes of his elder abuse conviction. Specifically, he argues "there is not substantial evidence that Phillips assumed the duties of a medical caretaker or that he failed to treat a known condition that left untreated would result in great bodily injury or death." We have no difficulty affirming the conviction.

9

On review of a sufficiency of the evidence claim, we "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; see *Jackson v. Virginia* (1979) 443 U.S. 307, 318–319.) "A reviewing court must accept logical inferences the [fact finder] might have drawn from the circumstantial evidence. [Citations.] ' "A reasonable inference, however, 'may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. [¶] . . . A finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence.' " ' " (*People v. Sifuentes* (2011) 195 Cal.App.4th 1410, 1416–1417.)

Section 368, subdivision (b)(1) provides: "Any person who knows or reasonably should know that a person is an elder or dependent adult and who, under circumstances or conditions likely to produce great bodily harm or death . . . [and] *having the care or custody of any elder or dependent adult*, willfully causes or permits the person or health of the elder or dependent adult to be injured, or willfully causes or permits the elder or dependent adult to be placed in a situation in which his or her person or health is endangered" is guilty of an elder abuse crime that is punishable by up to four years in prison.[4] (Italics added.) This statute "may be applied to a wide range of abusive

---

[4] In this case, the jury was instructed that, to "prove that the defendant is guilty of [elder abuse], the People must prove that: The defendant, while having care or custody of Janice Lacy, willfully caused or permitted her person or health to be injured; the defendant while having care or custody of Janice Lacy willfully caused or permitted her to be placed in a situation where her person or health was endangered; the defendant caused or permitted Janice Lacy to be injured or be endangered under circumstances or conditions likely to produce great bodily harm or death; Janice Lacy is an elder and when the defendant acted he knew or reasonably should have known that Janice Lacy was an elder; and the defendant was criminally negligent when he caused or permitted Janice Lacy to be injured or to be endangered. [¶] Someone commits an act willfully when he or she does it willingly or on purpose. 'Great bodily injury' means significant or substantial

10

situations, including within its scope active, assaultive conduct, as well as passive forms of abuse, such as extreme neglect. (Cf. *People v. Smith* (1984) 35 Cal.3d 798, 806 [construing identical language in felony child abuse statute].)" (*People v. Heitzman* (1994) 9 Cal.4th 189, 197 [construing § 368].)

The term "care" in section 368 "is not at all recondite or mysterious; no definition is necessary in order to give fair notice, and we doubt any definition could be given which would use simpler words or ones more likely to be understood. . . . [T]he statute in question here uses 'care,' in apposition to 'custody' and in the common sense of supervision or control, to define the class of persons who have elderly persons under their care . . . ." (*People v. Manis* (1992) 10 Cal.App.4th 110, 116–117, disapproved on other grounds by *People v. Heitzman, supra,* 9 Cal.4th at pp. 208–209 & fn. 17; see *Heitzman,* at p. 208 [favorably citing this passage from *Manis*].) "The terms 'care or custody' do not imply a familial relationship but only a willingness to assume duties correspondent to the role of a caregiver." (*People v. Cochran* (1998) 62 Cal.App.4th 826, 832 [construing phrase in § 273ab by analogy to § 368].)[5] No express agreement to care for the elder is necessary. (See *People v. Perez* (2008) 164 Cal.App.4th 1462, 1471, 1476 [construing § 273ab]; see also *People v. Morales* (2008) 168 Cal.App.4th 1075, 1083 [following *Cochran* and *Perez* on these points in a § 273a case].)

As a preliminary matter, we note the jury could easily have found Phillips had care or custody of Janice based on his own sweeping admissions during his interview with Byars. Phillips said Janice "doesn't remember anything"; he acknowledged that he "totally" assumed responsibility for Janice "as a caretaker"; and he said the alleged durable power of attorney "means that I do the thinking for her." However, even assuming the jury credited Phillips's later attempts to distinguish between his assumption

---

physical injury. It is injury that is greater than minor or moderate harm. An elder is someone who is at least 65 years old."

[5] Because child and elder abuse statutes are similar in wording and purpose, cases construing child abuse statutes are persuasive authority regarding shared language in elder abuse statutes. (See *People v. Cochran, supra,* 62 Cal.App.4th at p. 832.)

of responsibility for Janice's financial affairs from responsibility for her medical care, sufficient evidence supports a finding that Phillips had care or custody of Janice for purposes of her medical care.

An instructive case is *People v. McKelvey* (1991) 230 Cal.App.3d 399, where the defendant and his adult sister lived with their elderly mother who suffered from multiple sclerosis. (*Id.* at p. 401.) The siblings initially shared caretaking responsibilities for their mother: defendant cooked and maintained the home and his sister performed her personal care, including bathing, toiletry and cleaning clothes and linens. When the sister left because she felt overwhelmed, the defendant continued to cook for his mother but completely neglected her personal care (allegedly out of respect for his mother's modesty), even though he knew no one else was assisting her. He claimed his mother was alert and in charge of the household and could change her own diapers. (*Id.* at p. 402.) Four days after the sister left, the mother was found "in a hospital bed lying in excrement from her ankles to her shoulders. Maggots, ants and other insects crawled upon her. She had sores on her legs and complained of the insect bites. Her skin flaked when [a fireman] brushed the insects away. The house strongly smelled of excrement." (*Id.* at p. 401–402.) The court held there was sufficient evidence that the defendant had the care or custody of his mother, including her personal care, after his sister had left the home: "The deplorable condition in which emergency medical persons discovered Mrs. McKelvey belies defendant's contentions that she was in charge of the household, could summon assistance if necessary and could request clean diapers as needed. . . . [D]efendant was the only physically able, competent adult in the household after [his sister] left. As such, he was responsible for the care of his paralyzed, incapacitated mother, including her cleanliness." (*Id.* at pp. 404–405, fn. omitted; see *People v. Manis, supra,* 10 Cal.App.4th at p. 117 ["any definition of the word 'care' would include having in one's house a helpless relative, such as the victim, who could not feed herself due to Alzheimer's disease"]; *People v. Heitzman, supra,* 9 Cal.4th at p. 208 [favorably citing this passage from *Manis*]; *Heitzman,* at p. 221 [implying *Manis* correctly decided on its facts].)

12

Here, Phillips was the only physically able, competent adult in the household at a time when Janice inferably had lost the ability to manage her own health care. While a familial relationship between a defendant and victim is not necessary, we note that Phillips claimed Janice was his "wife." He also played an active and dispositive role isolating Janice from other people who could have assisted her: he caused Nichelle to leave Janice's home and impeded visits by all of Janice's children, and the jury could have inferred from the evidence that he cut off Janice's phone access and alienated Janice's affections from her children. Phillips emphasizes evidence that Janice's contact with her children was not *completely* cut off, but complete isolation is not required for a care or custody finding.

Phillips concedes that Janice developed dementia over the course of their relationship, but he suggests this was not the basis for his conviction. He writes, "Phillips was not accused of poor care of her dementia. He was accused of not taking her to the doctor and ensuring she took her medication." However, the medical evidence supported an inference that lack of care for Janice's diabetes caused her dementia and life-threatening high blood sugar. Phillips's admissions establish he was aware of Janice's diabetes diagnosis and related prescriptions, and he shared his view that Janice did not need medication or medical attention. Janice's condition on October 5, 2013, however, demonstrated Phillips must have been aware that this was not the case, as Janice had become profoundly demented and had lost the ability to provide even such basic self-care as showering and brushing her teeth. Even if Phillips did not understand the precise relationship between Janice's diabetes and her dementia, he could be held criminally liable for failing to ensure that Janice, who could no longer make her own health care decisions, obtained medical attention to assess the cause of her severe mental and physical deterioration. The financial evidence in the case supported an inference that Phillips deliberately failed to obtain medical care for Janice, not because he genuinely believed she did not need it, but because he wanted her to remain demented so that he could loot her assets and exploit her credit.

The elder abuse conviction is supported by substantial evidence.

13

B.    *Preparation of False Evidence*

Phillips also argues the evidence was insufficient to support his conviction for preparing false evidence in violation of section 134, which was based on his preparation of the power of attorney form. He argues the statute does not apply to evidence prepared to influence a police investigation as opposed to a trial or other official proceeding, and the power of attorney form he prepared was not "false." We disagree on both grounds.

Section 134 provides, "Every person guilty of preparing any false or ante-dated book, paper, record, instrument in writing, or other matter or thing, with intent to produce it, or allow it to be produced for any fraudulent or deceitful purpose, as genuine or true, *upon any trial, proceeding, or inquiry* whatever, authorized by law, is guilty of felony." (Italics added.) The statute's "objective is to prevent the fraudulent introduction of material in a proceeding under the authority of law," and the phrase " 'authorized by law' is broadly construed to include acts by a legal official acting within the scope of his authority." (*People v. Clark* (1977) 72 Cal.App.3d 80, 84.) In our view, a police investigation is self-evidently a legally authorized inquiry covered by the statute. Phillips argues the phrase "any trial, proceeding or inquiry whatever, authorized by law," construed in its entirety, "limit[s] the scope of the section to trial or quasi-trial proceedings or hearings." But "trial" does not modify the latter two terms "proceeding" and "inquiry," and those latter terms self-evidently encompass a range of activities that lack trial-like features such as advocacy, a neutral arbiter, or cross-examination. Moreover, all three terms are modified by the expansive term, "whatever," strongly signaling that the terms should be construed liberally rather than strictly.

Phillips claims section 134 has never been construed to apply to police investigation of crime. However, even if we accept his representation as true, "[t]he fact that section 134 has not been invoked outside the courtroom is not authority against permitting such use." (*People v. Clark, supra,* 72 Cal.App.3d at p. 84.) The cases cited by Phillips in fact illustrate that the statute has been given broad application to the preparation of false evidence for use in public university grievance hearings (*id.* at 82, 84), in court-ordered drug testing as a condition of probation (*People v. Morrison* (2011)

14

191 Cal.App.4th 1551, 1554–1556 [preparation of false urine sample]), and in a change-of-plea proceeding premised on compliance with probation terms (*People v. Laws* (1981) 120 Cal.App.3d 1022, 1027–1030). Phillips further argues the statute should be construed in his favor pursuant to the rule of lenity. That rule, however, does not apply where, as here, the statute is not susceptible of two reasonable interpretations. (See *Morrison*, at pp. 1556–1557.)

Phillips's second argument is that the power of attorney form he prepared was not false evidence because it was not altered or forged, but "stated exactly what Phillips said it did," i.e., that it granted him power of attorney over Janice's financial affairs. This district has previously considered the meaning of "false" in section 134 and held: "The plain language of section 134 does not require that a matter or other thing be altered or false 'on its face' . . . . Whether evidence is 'false' under section 134 depends upon what it is intended to depict or represent as 'genuine or true.' In other words, falsity is not an absolute quality. It can turn upon what the evidence is offered to prove." (*People v. Bamberg* (2009) 175 Cal.App.4th 618, 627.)

The form created by Phillips in October 2013 was false because the document falsely represented that Janice had knowingly and voluntarily granted Phillips power of attorney over her affairs at a time when she did not have the mental capacity to do so. That falsity was material to the police investigation in which Phillips offered the document: an investigation into Janice's welfare. On October 4, Phillips invoked his purported power of attorney to support his claim to speak on Janice's behalf, which included a denial that Janice had any medical problems and repeatedly insisting she did not want to talk to the officers and they should leave. That is, he invoked the power of attorney to impede investigation into Janice's welfare. Later that same afternoon, Phillips took steps to create the power of attorney document, inferably for the same purpose of impeding further police investigations into Janice's welfare. The following day, he drew police attention to the document, which was retrieved from Janice's home, and he affirmatively cited it during his interview with Byars as evidence that he had a legal right to make decisions for Janice, including financial decisions that were under investigation

at that time. In sum, sufficient evidence supports a conclusion that Phillips prepared a false paper with the intent to produce it in a police investigation into potential elder abuse.

The conviction for violating section 134 is supported by substantial evidence.

C.  *Presentence Credits*

Phillips's final claim is that the trial court miscalculated his presentence custody credits, both by undercounting his actual days of custody and by misapplying section 1170.12, subdivision (a)(5) with respect to calculation of credits pursuant to section 4019. (See *People v. Thomas* (1999) 21 Cal.4th 1122, 1125 [§ 1170.12, subd. (a)(5) does not apply to presentence custody].) The People concede the errors. We accept the concession and order Phillips's presentence custody credits to be increased to 657.[6]

## III.    DISPOSITION

The judgment is modified to reflect a total of 657 days of presentence custody credit. In all other respects, the judgment is affirmed. The superior court clerk shall send a corrected abstract of judgment to the California Department of Corrections and Rehabilitation.

---

[6] In a separate petition for writ of habeas corpus (No. A148937), Phillips has raised claims alleging a prosecution and law enforcement conspiracy to kidnap and murder Janice and challenging the competency of his trial and appellate counsel. We have denied that petition by separate order filed this date.

 

 

 

 

 

 

 

 

 

 

 

 

 

                                            _____

                                            Bruiniers, J.

 

 

 

We concur:

 

 

_____

Jones, P.J.

 

 

_____

Needham, J.