Filed 9/5/25; Modified and Certified for Pub. 10/2/25 (order attached)

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>NIMFA MOLINA,<br><br>        Defendant and Appellant. | E082376<br><br>(Super.Ct.Nos. RIF1601508,<br> RIF1604851)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Jerry C. Yang, Judge.

Affirmed.

Leech Tishman Nelson Hardiman Inc., Nelson Hardiman, and Mark Hardiman for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Collette C. Cavalier and Kathryn Kirschbaum, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury convicted Nimfa Molina of misdemeanor elder or dependent adult abuse. (Pen. Code, § 368, subd. (c); unlabeled statutory citations refer to this code.) Molina is a registered nurse, and the victim, 62-year-old Michael H., was a dependent adult under her care. Section 368, subdivision (c) (section 368(c)), states that a person "having the care or custody of any elder or dependent adult" may not (1) willfully cause or permit the victim's health to be injured or (2) willfully cause or permit the victim to be placed in a situation that may endanger the victim's health.

On appeal, Molina argues that the definition of "care or custody" in Welfare and Institutions Code section 15610.57, a provision of the Elder Abuse and Dependent Adult Civil Protection Act (Welf. & Inst. Code, § 15600 et seq.; Elder Abuse Act), applies to criminal prosecutions under section 368. She contends that under that definition, the record does not contain substantial evidence that she had care or custody of Michael. She also argues that the trial court erred by denying her request to instruct the jury with her proposed definition of care or custody. We affirm.

BACKGROUND

I.    *Trial evidence*

Secure Hands Incorporated (Secure Hands) had a business license to operate as a boarding house in Riverside, California, but the facility was not licensed to provide any medical care. Boarding houses are sometimes called independent living facilities. Independent living facilities are not regulated by the state Department of Social Services, and such facilities are for individuals who do not require care or supervision. People who

2

need help with activities of daily living (ADL's) should not live in a boarding house or independent living facility. ADL's include dressing, eating, ambulating or walking, transferring, toileting, and hygiene or bathing.

Joel Ombao owned Secure Hands and a number of other companies that provided home health and hospice services. Molina worked as a hospice nurse for one of Ombao's hospice companies. Ronnel Tiburcio was the marketer and "face" of Ombao's companies.[1]

The events underlying Molina's conviction occurred in January 2015. Early that month, Celeste and Gilbert Calma were hired to cook and clean at Secure Hands.[2] They lived at the facility and were each paid $50 per day. The Calmas were told that Secure Hands was an independent living facility and that the residents could handle their own ADL's. No one told them that they were expected to care for the residents.

Molina visited Secure Hands seven times in January 2015, and she saw Michael on three of those visits. Celeste had worked as a nurse in the Philippines for six months, but she was not licensed as a nurse in the United States. She told Molina that she was not licensed as a nurse. Molina told her to clean the facility like it was her own home. But Molina did not give her any instructions about taking care of the residents. Celeste expressed concern to Molina that some of the residents were unable to care for

---

[1] Molina was tried jointly with Ombao and Tiburcio. Those codefendants are not parties to this appeal.

[2] We refer to the Calmas by their first names because of their shared last name. No disrespect is intended. The Calmas pled guilty to elder abuse and testified at trial as part of their plea agreements.

themselves, and she told Molina that Secure Hands needed employees who could provide medical care. Celeste expressed the same concerns to Ombao and Tiburcio. She told Tiburcio that they needed "extra employees," like nurses and caregivers, because the Calmas were there only to cook and clean. The Calmas did not help the residents bathe or change wound dressings, for instance.

Michael was sent to Secure Hands after his discharge from the hospital, where he had been treated for a stroke and a shoulder abscess. On January 12, Molina conducted a three-hour initial assessment of Michael to determine whether he qualified for hospice benefits. According to the records of Molina's assessment, Michael's terminal condition was an acute cerebrovascular disease. He also had hypertension, schizophrenia, a history of heroin abuse and strokes, and stress incontinence. He was taking hydrocodone for pain management. His functional limitations included ambulating, bathing, continence, dressing, feeding, and transferring. Molina noted that he had paralysis in his right upper and lower extremities. She concluded that he needed a hospital bed and a wheelchair, but he did not yet have either one. She assessed him as "[d]isabled" and "requir[ing] special care and assistance," and she asked that he be assigned a home health aide. In the notes section of her assessment, Molina observed that Michael had fallen from his bed, so the caregiver had put his mattress on the floor. She further noted that she found Michael using a urinal when she arrived, but he was "already soak[ing] wet from his urine."

Molina's assessment identified Gilbert and "[C]ecille" as Michael's primary caregivers and noted that they would provide assistance with ADL's ("bathing, dressing,

4

toileting, bowel/bladder, eating/feeding") and medications. Molina's notes stated that she educated the primary caregivers about Michael's dietary and nutritional requirements, keeping him safe from falls and infection, and the importance of following his medication regimen. But according to Gilbert, he told Molina that he and Celeste were there only to cook and clean for the residents. Gilbert said that he could help but that he had not been trained as a caregiver. Gilbert testified that Michael was bedridden, weak, and "always asking for medication." Gilbert never gave Michael any medication.

Molina saw Michael again on January 14 for a one-hour skilled nursing visit, and she checked his condition and vital signs. She indicated that his needs were being met. According to her notes, the caregivers reported that Michael "like[d] to scream a lot" when asking for methadone and pain medication. She noted that he was "almost bed bound" and needed "total care." Molina next saw Michael on January 22 for another one-hour skilled nursing visit, again checking his condition and vital signs. She again indicated that his needs were being met. Her notes state that she found him "in bed screaming," complaining of generalized pain, and asking for methadone. She noted that she would ask the doctor to increase his pain medication. She also noted that he was "unable to care for himself" because "he just became bedbound."

Maria Bravo was a certified home health aide employed by one of Ombao's hospice companies. She visited Secure Hands to care for Michael. On her initial visit, Michael was very unkempt, and his clothes and bedding were soiled by urine. She bathed him, but he had no clean clothes or clean bedding at the facility. She had to dress

him in the soiled clothing, and she put him back on the mattress, which had only a plastic covering and no sheets. On Bravo's second visit, Michael's clothing again was soiled by urine. The urine was dried and crusted, as if he had urinated days ago.

Bravo reported Michael's condition to the hospice company. The hospice company sent two text messages conveying Bravo's concerns to Molina and a number of other recipients. The first message on January 14 stated: "Re: [Michael] Report from Maria Chha. She said the place is a dump. She stayed there for 1 1/2 hours.. Pt doesn't have clean clothes, no blankets, no sheets, no wash cloth.. They wanted her to place the pt on plastic.. Even after she washed the pt, they told her to put the same clothes on him that has pee on it."[3] (All grammatical and typographical errors are in the original.) The second message on January 21 stated: "Report from Maria Chha: Re: [Michael]. She said the cg doesn't change him. She goes 3x a wk but no one else washes him when she's not there. They just wait for her so by the time she gets there, his diaper is so wet.. And even when he vomitted, they don't wash him up. . . . She said they really need a cg cuz no one seems to clean them up when she's not there." (All grammatical and typographical errors are in the original.)

Nurses have a duty to ensure that caregivers can provide the level of care that a patient needs, and they are required by law to report suspected or known abuse of an elder or dependent adult. Molina did not make any reports regarding Michael.

---

[3]     In the text messages, "Chha" stands for certified home health aide, "pt" stands for patient, and "cg" stands for caregiver.

On January 24, a relative of a Secure Hands resident called the police after the relative visited the facility. When the responding officers entered the facility, they were overcome by the smell of human waste. The officers found one woman lying in fecal matter on a bare box spring. She had Alzheimer's disease and was unable to move on her own or speak. She was unclothed except for a soiled adult diaper, and there was a mattress next to her that had feces and urine all over it. A second woman was trapped under another mattress in the same room. The second woman was also unclothed except for an adult diaper, which was saturated with feces and urine, and tears were streaming from her eyes. She appeared weak and asked for water; she said that she had not had water for days. The officers found a male resident in another room who appeared to be having a seizure.

The officers found Michael in a third room. He was screaming for food and said that he had not eaten in awhile. He also said that he had limited mobility and could not get out of bed that day. The pad on his bed was soaked with urine, and he reported that the pad had not been changed in days. Michael told the officers that someone came to care for him a few days per week, but that person had not been there for awhile. The person bathed him and changed his bed pad, but if she did not visit, the pad could go days without being changed.

Michael was admitted to the hospital on January 25, after the police were called to Secure Hands. His medical records from that hospital stay show that he had a methicillin-resistant staphylococcus aureus (MRSA) infection. A MRSA infection is

resistant to "the more traditional antibiotics," and it tends to be more virulent, aggressive, and infectious than other bacterial infections.

The People called an expert in internal medicine and geriatric medicine, Dr. Khai Nguyen. According to the doctor, health care professionals use the Katz Index to assess a person's ability to live independently. Each ADL is assigned one point, so a fully independent person would achieve a score of six on the Katz Index. A person scoring two or less would be considered severely impaired. Dr. Nguyen opined that Michael had a score of one on the Katz Index and that Secure Hands was not an appropriate placement for Michael, given his severe impairment.

Officers interviewed Molina in March 2015. She explained that part of her job was to determine whether a hospice facility had the necessary caregivers. If the facility did not, then she would not admit the patient. She told the officers: "[A]nywhere I work . . . I make sure that someone is there to take care of them because that's why they need a higher level of care."

Molina told the officers that Secure Hands was supposed to be an independent living facility. But the Calmas told her that they were caregivers, and she did not question them. She said that she told the Calmas to care for the patients as if they were family and to treat the facility as if it were their own house. But she also acknowledged that the Calmas did not know how to properly care for a patient and that "they should have hired someone who is more experienced."

8

II.   *Procedural background*

The People charged Molina with four counts of felony elder or dependent adult abuse.  One count alleged abuse of Michael, and three counts alleged abuse of other victims.  (§ 368, subd. (b)(1).)  Before trial, the court dismissed one of those counts.

The trial occurred in June and July 2023.  The jury deadlocked on two counts, and the court declared a mistrial on those counts.  With respect to the count alleging abuse of Michael, the jurors found Molina guilty of the lesser included misdemeanor offense. (§ 368(c).)  In October 2023, the court sentenced Molina to four months in county jail and a fine of $1,000.

DISCUSSION

I.   *Substantial evidence of care or custody*

Molina argues that Welfare and Institutions Code section 15610.57, a provision of the Elder Abuse Act, defines "care or custody" for purposes of section 368(c).  She contends that under that definition, the record does not contain substantial evidence that she had care or custody of Michael.  The argument lacks merit.

"The proper interpretation of a statute is a question of law we review de novo." (*People v. Lewis* (2021) 11 Cal.5th 952, 961.)  In resolving a substantial evidence challenge, we review "the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt."  (*People v. Kipp* (2001) 26 Cal.4th 1100, 1128.)  We resolve all conflicts in the

9

evidence and credibility questions in favor of the jury's verdict. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

Section 368 imposes criminal liability for elder or dependent adult abuse. (*People v. Racy* (2007) 148 Cal.App.4th 1327, 1334-1335.) A dependent adult includes a person "between the ages of 18 and 64, who has physical or mental limitations which restrict their ability to carry out normal activities or to protect their rights." (§ 368, subd. (h).) In relevant part, section 368(c) provides that a person is guilty of a misdemeanor if that person has "the care or custody of any . . . dependent adult" and "willfully causes or permits the person or health of the . . . dependent adult to be injured or willfully causes or permits the . . . dependent adult to be placed in a situation in which their person or health may be endangered."[4] (§ 368(c).)

The Legislature modeled section 368 on the statutes criminalizing child abuse. (*Heitzman*, *supra*, 9 Cal.4th at p. 202.) "When drafting the new legislation, the bill's author lifted the language of the child abuse statutes in its entirety, replacing the word 'child' with 'dependent adult' throughout." (*Id*. at pp. 202-203; see, e.g., § 273a, subd.

---

[4] Section 368(c) imposes criminal liability on two categories of defendants who permit dependent adult abuse: (1) people who have care or custody of the victim and who willfully permit the victim to be injured or placed in a dangerous situation; and (2) people who willfully permit the victim to suffer and who stand in a special relationship to the individual inflicting the suffering. (*People v. Heitzman* (1994) 9 Cal.4th 189, 197, 212 (*Heitzman*) [interpreting the same language in the felony provision].) Molina also contends that there is not substantial evidence showing that she had a special relationship with the Calmas, the individuals who purportedly inflicted Michael's suffering. But the parties agree that the prosecutor's sole theory of liability was that Molina had care or custody of Michael. The court did not instruct the jurors on the special relationship theory of the offense. (CALCRIM No. 831, alternative 1.B and element 4.)

(b) [any person who, "having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or willfully causes or permits that child to be placed in a situation where his or her person or health may be endangered" is guilty of a misdemeanor].) Thus, decisions construing "care or custody" in the child abuse statutes guide us in construing the same terms in section 368. (*Heitzman*, at pp. 204-205.)

The terms "care" and "custody" in the child abuse and dependent adult abuse statutes have "no special meaning . . . beyond the plain meaning of the terms themselves." (*People v. Cochran* (1998) 62 Cal.App.4th 826, 832.) And the "word 'care' as used in section 368 is not at all recondite or mysterious; no definition is necessary in order to give fair notice." (*People v. Manis* (1992) 10 Cal.App.4th 110, 116-117, disapproved on another ground by *Heitzman*, *supra*, 9 Cal.4th at p. 209, fn. 17.) Moreover, "[m]edical practitioners, who are often in charge of the care and custody of a dependent adult, would seem to be one of the prime target groups at which [section 368] is aimed." (*People v. Superior Court (Holvey)* (1988) 205 Cal.App.3d 51, 61, disapproved on another ground by *Heitzman*, at p. 209, fn. 17.) "[N]othing in the statute or its legislative history . . . demonstrates an intent to exempt medical practitioners from the ambit of the statute." (*Holvey*, at p. 61.)

Courts interpreting the parallel child abuse statutes have concluded that individuals who have care or custody include "not only parents, guardians, and babysitters, but also individuals who do not necessarily have as substantial a relationship to a child." (*People v. Perez* (2008) 164 Cal.App.4th 1462, 1469 [reviewing evidence of

11

care or custody under § 273a].) Anyone who has "been entrusted with the care of a child, even for a relatively short period of time," may qualify. (*Perez*, at p. 1469.) For instance, in *People v. Malfavon* (2002) 102 Cal.App.4th 727, the child's mother left the child sleeping in a car seat, and the mother's boyfriend was in the car or just outside the car smoking a cigarette. (*Id.* at p. 731.) The mother went into her apartment to gather some belongings for an overnight stay, and the boyfriend admitted that he was responsible for watching the child while the Mother was in her apartment. (*Id.* at pp. 731, 737.) The court concluded that there was substantial evidence that the boyfriend had care or custody of the child. (*Id.* at pp. 736-737 [reviewing evidence of care or custody under § 273ab].)

Along the same lines, in *People v. Morales* (2008) 168 Cal.App.4th 1075, the defendant had a 16-year-old acquaintance in his passenger seat when he led police on a car chase that ended in a collision. (*Id.* at p. 1078.) Some evidence indicated that the teenager had asked him for a ride, and other evidence showed that he had invited her so that she could direct him to a particular destination. (*Id.* at p. 1078, fn. 2.) Either way, there was no evidence of a robust caretaking relationship. (*Id.* at p. 1083.) The court nevertheless found that there was substantial evidence that the defendant had care or custody of the girl. (*Id.* at pp. 1083-1084 [reviewing evidence of care or custody under § 273a].) She was physically in his care while he was driving, she was not free to leave his speeding car, and she had no control over the car. (*Morales*, at pp. 1083-1084.) "[I]n taking it upon himself to control [the girl's] environment and safety," the defendant

12

"undertook caregiving responsibilities or assumed custody over her while she was in his car." (*Id.* at p. 1084.)

The record in this case contains substantial evidence that Molina "ha[d] the care" of Michael under any plain meaning of the term. (§ 368(c).) The evidence showed that she was the nurse charged with determining whether to admit him to Secure Hands as a hospice patient. During her three-hour assessment of him, she learned of his various medical conditions and functional limitations, including that he was incapable of performing most ADL's without assistance. She determined what durable medical equipment he needed (a hospital bed and wheelchair) and that he needed a home health aide. She was supposed to ensure that the facility had caregivers who would meet Michael's needs. It did not, and she knew that Secure Hands was merely an independent living facility, but she admitted him anyway. Both of her hour-long nursing visits were around the time that she received complaints from the home health aide about the inadequacy of the care that Michael was receiving, particularly with respect to his toileting or incontinence. And during her nursing visits, she checked Michael's condition and vital signs and learned that he was screaming because of pain or his desire for medication. She determined that he needed a larger dose of medication to manage his pain and indicated that she would request that from the doctor. The fact that the Calmas or others may have also had care or custody of Michael does not preclude Molina from "having [his] care" within the meaning of section 368(c). "The language of the statute

13

does not suggest that only one person at a time can have the care or custody of" a dependent adult. (*People v. Perez, supra*, 164 Cal.App.4th at p. 1472.)

In sum, Molina took it upon herself to control Michael's environment and safety. She determined whether Michael would receive hospice benefits, whether he would have appropriate caregivers at Secure Hands, and what kind of equipment he would need to assist with his ADL's. She also checked his condition at regular intervals. All of that constitutes substantial evidence that Molina "ha[d] the care" of Michael for purposes of section 368(c).

Molina does not argue that there is insufficient evidence of care or custody under the ordinary or plain meaning of the terms. Rather, she argues that our Supreme Court's interpretation of the definition of "care or custody" in the Elder Abuse Act applies in criminal elder abuse cases under section 368. She relies on *Winn v. Pioneer Medical Group, Inc.* (2016) 63 Cal.4th 148 (*Winn*), but the Elder Abuse Act and *Winn* are not controlling.

The Elder Abuse Act provides heightened remedies to plaintiffs who prove physical abuse or neglect by clear and convincing evidence. (*Winn, supra*, 63 Cal.4th at p. 152.) *Winn* involved a claim of neglect against health care providers. (*Id.* at pp. 152, 156.) The Elder Abuse Act defines neglect as the "negligent failure of any person having the care or custody of an elder or a dependent adult to exercise that degree of care that a reasonable person in a like position would exercise." (Welf. & Inst. Code, § 15610.57, subd. (a)(1).) The same section provides a nonexhaustive list of examples of neglect:

Neglect includes (1) "[f]ailure to assist in personal hygiene, or in the provision of food, clothing, or shelter"; (2) "[f]ailure to provide medical care for physical and mental health needs"; (3) "[f]ailure to protect from health and safety hazards"; and (4) "[f]ailure to prevent malnutrition or dehydration."  (Welf. & Inst. Code, § 15610.57, subd. (b)(1)-(4).)

The *Winn* court held that a health care provider is not liable for neglect under the Elder Abuse Act unless the "provider had a substantial caretaking or custodial relationship, involving ongoing responsibility for one or more basic needs, with the elder patient." (*Winn*, *supra*, 63 Cal.4th at p. 152.)  That conclusion followed from the statutory definition of neglect and the list of examples.  (*Id.* at pp. 157-159.)  The court reasoned that those "examples add some context elucidating the statute's meaning— context that supports inferences about the sort of conduct the Legislature sought to address from individuals 'having the care or custody' of an elder.  What they each seem to contemplate is the existence of a robust caretaking or custodial relationship—that is, a relationship where a certain party has assumed a significant measure of responsibility for attending to one or more of an elder's basic needs that an able-bodied and fully competent adult would ordinarily be capable of managing without assistance.  [¶]  One would not normally expect an able-bodied and fully competent adult to depend on another for 'assist[ance] with personal hygiene' or 'protect[ion] from health and safety hazards,' any more than one would expect a party with only circumscribed, intermittent, or episodic engagement to be among those who 'have . . . care or custody' of someone who may be particularly vulnerable. . . . Ultimately, the focus of the statutory language is

15

on the nature and substance of the relationship between an individual and an elder or a dependent adult. This focus supports the conclusion that the distinctive relationship contemplated by the [Elder Abuse] Act entails more than casual or limited interactions." (*Id.* at p. 158.)

Because the *Winn* complaint alleged that the defendants merely treated the elder intermittently at outpatient clinics, the complaint did not support a claim for neglect under the Elder Abuse Act. (*Winn*, *supra*, 63 Cal.4th at p. 165.) The complaint did not show that the elder "relied on [the] defendants in any way distinct from an able-bodied and fully competent adult's reliance on the advice and care of his or her medical providers," so the "defendants lacked the needed caretaking or custodial relationship with the decedent." (*Ibid.*)

Molina relies in particular on *Winn*'s conclusion that the Elder Abuse Act "contemplate[s] . . . the existence of a robust caretaking or custodial relationship—that is, a relationship where a certain party has assumed a significant measure of responsibility for attending to one or more of an elder's basic needs." (*Winn*, *supra*, 63 Cal.4th at p. 158.) She contends that because there is no evidence that she assumed significant responsibility for any of Michael's basic needs, she did not have care or custody of him within the meaning of section 368(c).

The argument lacks merit. The Elder Abuse Act states that the statutory definitions contained in it, which include the definition of neglect, govern the construction of the act. (Welf. & Inst. Code, § 15610.) But section 368 is not in the

16

Elder Abuse Act, and the term "neglect" does not appear in section 368. More importantly, nothing resembling the list of examples of neglect appears in section 368. Those examples were a central basis for the court's holding that an Elder Abuse Act claim for neglect requires "a substantial caretaking or custodial relationship, involving ongoing responsibility for one or more basic needs." (*Winn*, *supra*, 63 Cal.4th at p. 152.)

Other reasoning in *Winn* likewise does not apply to criminal prosecutions under section 368. *Winn* contrasted the examples of neglect "and the underlying concept of neglect they imply . . . with the sort of conduct triggering more conventional tort liability" for professional negligence. (*Winn*, *supra*, 63 Cal.4th at p. 159.) For instance, a doctor's failure to refer a patient to a specialist, which the defendants in *Winn* allegedly failed to do (*id.* at p. 154), might "give rise to tort liability even in the absence of a caretaking or custodial relationship" (*id.* at p. 159). But the Elder Abuse Act and its heightened remedies would not apply to the cause of action for professional negligence. (Welf. & Inst. Code, § 15657.2; *Winn*, at pp. 159-160.) "[T]he Legislature enacted a scheme distinguishing between—and decidedly not lumping together—claims of professional negligence and neglect." (*Winn*, at p. 159.) Nothing in the legislative history showed "that the Legislature intended the [Elder Abuse] Act to apply *whenever* a doctor treats any elderly patient. Reading the act in such a manner would radically transform medical malpractice liability relative to the existing scheme," and there was no indication that the Legislature intended such a transformation. (*Id.* at p. 163.) The court

17

reasoned that the specialized definition of neglect avoided "[b]lurring the distinction between" Elder Abuse Act claims and medical malpractice claims. (*Id.* at p. 160.)

In a criminal case like this one, we are not concerned with preserving the distinction between neglect under the Elder Abuse Act and medical malpractice. The question of Molina's criminal liability is distinct from the question of her civil liability for either one. And to the extent that she argues that her conduct is "relevant to a civil professional negligence claim" but cannot be the basis for a criminal conviction under section 368, that is incorrect. It is possible that a health care provider's conduct could give rise to both criminal liability and liability for professional negligence.[5] (See *Lopez v. Ledesma* (2022) 12 Cal.5th 848, 864-865.)

Molina points out that *Winn* discusses section 368. It does, but the brief discussion does not compel us to read "care or custody" in an identical manner for purposes of section 368 and the Elder Abuse Act. The *Winn* court observed that its reading of the Elder Abuse Act fit with how the court had "interpreted analogous statutory provisions arising beyond" the act. (*Winn*, *supra*, 63 Cal.4th at p. 161.) For instance, *Heitzman* concerned section 368 and "noted that the statutory language was 'derive[d] verbatim from the felony child abuse statute.'" (*Winn*, at p. 162, quoting

---

**5** Along the same lines, to the extent that Molina argues that her conduct may be a criminal violation of her "mandated reporter" duties (Welf. & Inst. Code, § 15630, subds. (a)-(b), (h)) but cannot also be a violation of section 368, that too is incorrect. "Because our Penal Code is so expansive, the same conduct can violate more than one criminal statute." (*People v. Corpening* (2016) 2 Cal.5th 307, 309.) A health care provider's duty to report dependent adult abuse "should not relieve them from criminal liability" under section 368, just as a teacher's duty to report child abuse does not relieve them from criminal liability for abusing a child. (*Holvey*, *supra*, 205 Cal.App.3d at p. 61.)

18

*Heitzman*, *supra*, 9 Cal.4th at p. 204.)  "Analyzing the statutory language and legislative history," *Heitzman* determined that the purpose of both "abuse statutes was to 'protect the members of a vulnerable class from abusive situations,' which usually arose where caretakers or custodians responsible for the basic needs of these vulnerable, dependent populations failed to provide for their charges."  (*Winn*, at p. 162.)  *Winn* reasoned that the Elder Abuse Act "invokes a similar caretaking or custodial relationship," even though it "defines neglect for civil liability purposes."  (*Winn*, at p. 162.)

*Winn*'s observations about section 368 are not binding.  The *Winn* court was not tasked with deciding the meaning of "care or custody" for purposes of section 368.  (See *Santisas v. Goodin* (1998) 17 Cal.4th 599, 620 ["An appellate decision is not authority for everything said in the court's opinion but only 'for the points actually involved and actually decided'"].)  *Heitzman* similarly did not decide the meaning of "care or custody" in section 368.  The case concerned a different theory of liability under section 368, and that theory does not require that the defendant have care or custody of the victim (see fn. 4, *ante*).  (*Heitzman*, *supra*, 9 Cal.4th at pp. 204 & fn. 13, 206; *id.* at p. 212 [a defendant who does not have care or custody of the victim cannot be liable for permitting the victim to suffer unless the defendant "stand[s] in a special relationship to the individual inflicting the abuse . . . such that the defendant is under an existing duty to supervise and control that individual's conduct"].)

Moreover, here is what *Heitzman* said about the caretakers who might be liable under section 368:  "The following profile of who might be covered under the legislation

was presented to members of the Senate Judiciary Committee: 'The person who abuses is usually the caretaker of the victim, that is, the person who officially or informally assumes responsibility for the care of the dependent person. This includes caretakers in licensed family homes or relatives: children, grandchildren or parents of the younger dependent adult.' [Citation.] Thus, it is no surprise that the imposition of a duty on those having care or custody of an elder to protect his or her charge from injury or dangerous situations is expressly set forth in the second and third clauses of the statute." (*Heitzman*, *supra*, 9 Cal.4th at p. 204.) Whatever the profile of the typical abuser "who might be covered" (*ibid.*), the description does not preclude Molina from having the care or custody of Michael. As already explained, there is ample evidence that she assumed responsibility for Michael's care, even if others (like the Calmas) also assumed responsibility for his care.

Finally, although Molina relies primarily on *Winn* and other civil cases arising under the Elder Abuse Act, she also relies on a felony child abuse case, *Bom v. Superior Court* (2020) 44 Cal.App.5th 1 (*Bom*). *Bom* is distinguishable.

The People charged social workers in *Bom* with child abuse under section 273a. (*Bom*, *supra*, 44 Cal.App.5th at p. 12.) The statute applies to "persons who committed specified criminal acts or omissions while having the '"care or custody"' of the child victim." (*Ibid.*) The social workers provided emergency and family maintenance services to the seven-year-old victim and his family. (*Id.* at p. 4.) Although the workers visited the family home several times, the child was not taken into temporary or

protective custody, detained from the mother, or removed from her custody. (*Id.* at pp. 5-10.) The case instead was referred to the family preservation unit, which provided family maintenance services on a voluntary basis as an alternative to dependency proceedings. (*Id.* at pp. 7, 9.) Weeks after the child welfare agency closed its case, the child died as a result of neglect and abuse inflicted by the mother and her boyfriend. (*Id*. at p. 4.)

The *Bom* court concluded that the social workers did not have care or custody of the child for purposes of the child abuse statute. (*Bom*, *supra*, 44 Cal.App.5th at p. 4.) The workers never had legal or physical custody of the child. (*Id.* at p. 17.) In addition, there was no evidence that they lived with the child; fed, bathed, or babysat him; were present with him while his mother or her boyfriend were away or slept; provided him with food or clothing; "or otherwise assumed a role as his caretaker or caregiver." (*Id.* at pp. 18-19.) The People relied on various provisions of the Welfare and Institutions Code requiring social workers to respond immediately to emergency situations, consider providing appropriate services, and arrange for family maintenance services. (*Bom*, at p. 22.) But the court held that those statutory duties did not constitute "'having the care or custody'" of the child within the meaning of section 273a. (*Bom*, at p 22.)

Molina's role in this case was much more significant than that of the social workers in *Bom* who investigated allegations and arranged for family maintenance services. Michael depended on Molina to assess his condition, decide the type of basic care and equipment he needed, determine whether there were appropriate employees at Secure Hands to provide the necessary care, and decide whether he would stay there or

21

go to a more appropriate facility.  Although she may not have directly provided assistance with ADL's, her decisions determined whether he would receive that assistance with bathing, dressing, toileting, and eating.  She also provided direct care during her two skilled nursing visits.

For all of the foregoing reasons, we reject Molina's argument that the Elder Abuse Act and *Winn* control the definition of "care or custody" for purposes of section 368.  The record contains substantial evidence that Molina "ha[d] the care" of Michael under the ordinary or plain meaning of the term.  (§ 368(c).)

II.      *Claimed instructional error*

The trial court instructed the jury with CALCRIM No. 831, the pattern jury instruction defining the elements of misdemeanor elder or dependent adult abuse.  The pattern instruction does not contain a definition of care or custody.  (CALCRIM No. 831.)  Molina proposed a special jury instruction defining care or custody, which was based on *Winn* and other civil cases concerning neglect under the Elder Abuse Act.[6]

Molina argues that the court erred by denying her request to give the special instruction.  But as already explained, *Winn* and the Elder Abuse Act do not define care or custody under section 368.  It follows that the court did not err by declining to instruct

---

[6]      Molina's proposed instruction stated:  "A person has *care or custody* of an elder or a dependent adult if the person has assumed significant responsibility for attending to one or more of the basic needs of the elder or dependent adult that an able-bodied and fully competent adult would ordinarily be capable of managing without assistance, including housing, clothing, hydration, nutrition, personal hygiene, and obtaining medical care.  A healthcare provider's provision of adequate or inadequate medical care to a patient who is an elder or dependent adult by itself does not prove that the provider has *care or custody* of that elder or dependent adult with respect to his or her basic needs."

22

the jury with Molina's proposed special instruction.  (*People v. Moon* (2005) 37 Cal.4th 1, 30 ["a trial court may properly refuse an instruction offered by the defendant if it incorrectly states the law"].)

## DISPOSITION

The judgment is affirmed.

MENETREZ
                                                                              J.

We concur:

RAMIREZ
               P. J.

FIELDS
               J.

Filed 10/2/25

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | E082376 |
| Plaintiff and Respondent, | (Super.Ct.Nos. RIF1601508 & RIF1604851) |
| v. | MODIFICATION OF OPINION |
| NIMFA MOLINA, | AND ORDER GRANTING PUBLICATION |
| Defendant and Appellant. | [NO CHANGE IN JUDGMENT] |

_____

We modify the opinion as follows:

1.      On page 2 of the opinion, after the second paragraph and before the "BACKGROUND" heading, insert the following paragraph:

We publish this opinion to clarify that the terms "care" and "custody" in section 368(c) should be interpreted according to their plain and ordinary meaning.  That is the longstanding interpretation of the same terms in the statutes criminalizing child abuse, on which section 368 was modeled.  Our Supreme Court's interpretation of "care or custody" in *Winn v. Pioneer Medical Group, Inc.* (2016) 63 Cal.4th 148 (*Winn*) does not require a different conclusion.  *Winn* interpreted the terms' meaning in the Elder Abuse Act, and the court based its interpretation primarily on language defining neglect for purposes of that act.  (*Winn*, at pp. 157-159.)  The Elder Abuse Act's definition of neglect does not apply to section 368, and section 368 does not contain any similar language.

2.      On page 14 of the opinion, in the second full paragraph, the last sentence is deleted and replaced with the following:

She relies on *Winn*, but the Elder Abuse Act and *Winn* are not controlling.

Except for the modification, which does not affect the judgment, the opinion is unchanged.

In addition, we GRANT the request to publish the opinion filed in this case, which meets the standard for publication in California Rules of Court, rule 8.1105(c). The court orders the opinion filed on September 5, 2025, certified for publication.

CERTIFIED FOR PUBLICATION

MENETREZ
J.

We concur:

RAMIREZ
P. J.

FIELDS
J.

2